In the MATTER OF Petition for Naturalization of Richard John LONGSTAFF, Petitioner.

No. 82–1218.

United States Court of Appeals, Fifth Circuit.

Sept. 28, 1983.

Rehearing and Rehearing En Banc Denied Oct. 27, 1983.

Brian K. Bates, Dallas, Tex., for appellant.

Leonard Graff, San Francisco, Cal., for amicus curiae Gay Rights Advocates Nat'l Gay Task Force.

Margaret Perry, Lauri Steven Filppu, Gen. Lit. & Legal Advice Sect., Crim. Div., U.S. Dept. of Justice, Washington, D.C., for appellee.

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. Indeed, Longstaff had reason to anticipate progressive social tolerance toward homosexuality. Private homosexual activity between consenting adults had recently been decriminal-

Before RUBIN and TATE, Circuit Judges, and STAGG *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

May a resident alien be denied naturalization because he was a homosexual at the time he was admitted to the United States? The district court, 538 F.Supp. 589, answered this question in the affirmative. We affirm its judgment that the petitioner is ineligible for naturalization because, being excludable on the ground of his homosexuality when he arrived here, he was not lawfully admitted to the United States.

## I.

Richard John Longstaff, now forty-three, is a native and citizen of the United Kingdom of Great Britain and Northern Ireland. On November 14, 1965, he was admitted to the United States as a permanent resident. Before he arrived in the United States, Longstaff filled out a form entitled "Application for Immigrant Visa and Alien Registration." To the question:

> 3(b) Are you now or have you ever been afflicted with psychopathic personality, epilepsy, mental defect, fits, fainting spells, convulsions or a nervous breakdown?

Longstaff answered, "No." The question was based on a provision of the Immigration & Nationality Act (the Act), 8 U.S.C. § 1182(a) (1976 & Supp. V 1981), excluding persons thus "afflicted." Congress intended the term "psychopathic personality" to designate homosexuals as well as persons having psychopathic disorders, as that term is generally understood. However, no evidence suggests that Longstaff knew or had reason to know that "psychopathic personality" was a term of art that included homosexuals and consequently excluded them from admission to the United States.[1]

ized in Great Britain in accordance with the recommendations of the 1963 Report of the Great Britain Committee on Homosexual Offenses and Prostitution, known as the Wolfenden Report.

Longstaff eventually settled in Texas, where he established himself in business. He owns two shops, operated under the trade name Union Jack, selling clothing and offering hairdressing services to both men and women. He has never been charged with any offense other than traffic violations. Reputable witnesses testified that they believe him to be a person of good moral character.

In his fifteenth year of residence, Longstaff sought naturalization as a citizen of the United States. He was recommended by the naturalization examiner, but the district court denied naturalization because it found that Longstaff had violated the Texas Penal Code by engaging in homosexual activity, had exhibited a lack of candor in answering questions about his sexual activities, and had failed to carry his burden of establishing good moral character as required by 8 U.S.C. § 1427(a)(3) (1976). We affirmed on appeal solely on the ground that Longstaff had failed to discharge his burden of proof. *In re Longstaff*, 631 F.2d 731 (5th Cir.1980) (per curiam). We remanded, however, to afford Longstaff an opportunity to adduce additional evidence of his good moral character. *In re Longstaff*, 634 F.2d 629 (5th Cir.1980) (on rehearing).

Thereafter, pursuant to the district court's pretrial order, an examiner for the Immigration and Naturalization Service (the INS) interrogated Longstaff. The examiner concluded that Longstaff had met his burden of establishing good moral character; nevertheless, he recommended denial of the petition because Longstaff had engaged in homosexual activity before entering the United States in 1965. He concluded that Longstaff (1) had been excludable

under the Act; (2) had not been "lawfully admitted," as the Act requires for naturalization, and (3) could not be naturalized. After a trial de novo, the district court again denied Longstaff's petition for naturalization on this basis.[2]

## II.

No person may be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of the Act.[3] The applicant has the burden of proving that he entered the United States lawfully.[4] Longstaff argues that, because he was granted a visa and admitted in procedurally regular fashion, he is eligible for naturalization even if, for any reason, he should have been excluded.

That narrow reading of the term "lawfully admitted" distorts its meaning. Admission is not lawful if it is regular only in form. The term "lawfully" denotes compliance with substantive legal requirements, not mere procedural regularity, as the definition provided by Congress plainly establishes: "the term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant *in accordance with the immigration laws,* such status not having changed.[5] Section 1429's added requirement "in accordance with all applicable provisions of [the Act]" is not merely redundant, but emphatic and embracive.

The provisions concerning deportation demonstrate that what is essential is lawful status, not regular procedure. An alien is subject to deportation if "at the time of entry [he] was within one or more of the classes of aliens excludable by the law ex-

**2.** The district court also held that Longstaff had failed to establish good moral character, had exhibited lack of candor before the INS and the court by answering questions about his homosexual conduct untruthfully, and had committed crimes involving moral turpitude because he had violated Texas law by engaging in homosexual acts. In view of our decision, we do not reach these questions. We note, however, that the INS did not attempt to support the trial court's conclusions on appeal: it conceded

that Longstaff had met his burden of proving good moral character and it did not brief the issue of lack of candor.

**3.** 8 U.S.C. § 1429 (1976).

**4.** *Id.*

**5.** 8 U.S.C. § 1101(a)(20) (1976) (emphasis added).

isting at the time of such entry."[6] This clause overlaps the provision for deportation of any person who "is in the United States in violation of [the Act] or in violation of any other law of the United States."[7] By providing for the deportation of excludable aliens, the Act implies that such persons, though present in the United States, were not "lawfully admitted."

The Act lists thirty-three classes of persons who are "ineligible to receive visas and shall be excluded from admission into the United States."[8] It would be paradoxical if a person who was ineligible to receive a visa and should have been excluded from admission became lawfully admitted simply because, by error, he was not excluded. We decline to read a congressional enactment so absurdly. We turn, therefore, to Longstaff's argument that he was not excludable at entry.

### III.

Among the classes of aliens ineligible to receive visas and excluded from lawful admission to the United States by the Act are "aliens afflicted with psychopathic personality."[9] Before the statute in terms referred to "sexual deviation," as it now does, the Supreme Court held in *Boutilier v. Immigration & Naturalization Service*, 387

U.S. 118, 120, 87 S.Ct. 1563, 1565, 18 L.Ed.2d 661, 664 (1967): "The legislative history of the Act indicates beyond a shadow of a doubt that the Congress intended the phrase 'psychopathic personality' to include homosexuals ...."[10] Because Congress has plenary power over the admission of aliens, the Act was constitutional even if the term "psychopathic personality" did not give fair warning to the ordinary person that the phrase included homosexuals.[11] Furthermore, the Court held that the statute was constitutional because it applied to characteristics the alien possessed "at the time of his entry" and was not a sanction proscribing later conduct.[12]

■ Congress has unbounded power to exclude aliens from admission to the United States.[13] Our national immigration policy was for many years based on national origin quotas that reflected racial and ethnic prejudice. Congress can bar aliens from entering the United States for discriminatory and arbitrary reasons, even those that might be condemned as a denial of equal protection or due process if used for purposes other than immigration policy to draw distinctions among people physically present within the borders of the United States.[14] The constraints of rationality im-

---

**6.** 8 U.S.C. § 1251(a)(1) (1976).

**7.** *Id.* § 1251(a)(2).

**8.** *Id.* § 1182(a) (1976 & Supp. V 1981).

**9.** 8 U.S.C. § 1182(a)(4) (1976). The Act currently provides:
(a) Except as otherwise provided in this [Act], the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:
....
(4) Aliens afflicted with psychopathic personality, sexual deviation, or a mental defect.

**10.** The statute before the *Boutilier* Court read:
(a) Except as otherwise provided in this Act, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:
....
(4) Aliens afflicted with psychopathic personality, epilepsy, or a mental defect.
8 U.S.C. § 1182(a)(4) (1964). Congress amended this section, substituting "sexual deviation" for "epilepsy," in 1965. Act of Oct. 3, 1965,

Pub.L. No. 89–236, § 15(b), 79 Stat. 917, 919 (codified at 8 U.S.C. § 1182(a)(4) (1976)).

**11.** *Boutilier*, 387 U.S. at 123–24, 87 S.Ct. at 1566–67, 18 L.Ed.2d at 665–66. A contrary holding by the Ninth Circuit led Congress to amend the statute to refer specifically to sexual deviation. S.Rep. No. 748, 89th Cong., 1st Sess. 18–19 (1965), U.S.Code Cong. & Admin. News 1965, p. 3328.

**12.** *Id.* at 123, 87 S.Ct. at 1566, 18 L.Ed.2d at 665.

**13.** *See generally, Developments in the Law—Immigration Policy and the Rights of Aliens*, 96 Harv.L.Rev. 1286, 1311–33 (1983); *Note, Constitutional Limits on the Power to Exclude Aliens*, 82 Colum.L.Rev. 957 (1982).

**14.** *See Plyler v. Doe*, 457 U.S. 202, 210–16, 102 S.Ct. 2382, 2391–94, 72 L.Ed.2d 786, 795–98 (1982) (even aliens whose presence in country is unlawful are guaranteed equal protection and due process of law by fifth and fourteenth amendments).

posed by the constitutional requirement of substantive due process and of nondiscrimination exacted by the equal protection component of the due process clause [15] do not limit the federal government's power to regulate either immigration or naturalization.[16] Thus, the Constitution does not require our national immigration policy to be consistent with the prohibition of discrimination by federal agencies [17] and by state governments and private persons.[18]

Longstaff does not question any of these elementary principles. He contends that the Act does not exclude homosexuals on the basis that they are determined judicially to have such a sexual preference or even on the basis that they state that they have this preference, but that it is designed to exclude only those persons declared by a Public Health Service (PHS) medical officer to be "afflicted" with "psychopathic personality" or "sexual deviation." He premises

his argument on the Act's separation of medical from other reasons for exclusion. Because the exclusion of those afflicted with psychopathic personality is contained in a clause enumerating medical bases for exclusion,[19] Longstaff argues, excludibility for homosexuality must be determined in the same fashion and by the same procedures as excludability for affliction with a mental defect or a dangerous contagious disease. Because these conditions are "subject to medical determination," he contends that only a medical officer has the power to determine whether any of them exists.

The Public Health Service, in a report to the House of Representatives on the medical aspects of the House bill that later became the Immigration and Nationality Act of 1952, suggested grouping together excludable "conditions related to the field of mental disorders and subject to medical determination." [20] For a number of years

**15.** See Davis v. Passman, 442 U.S. 228, 234–35, 99 S.Ct. 2264, 2271–72, 60 L.Ed.2d 846, 855–56 (1979) (fifth amendment due process clause includes equal protection guarantees); Jimenez v. Weinberger, 417 U.S. 628, 637, 94 S.Ct. 2496, 2502, 41 L.Ed.2d 363, 371 (1974) (same).

**16.** Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50, 56 (1977); Boutilier, 387 U.S. at 123, 87 S.Ct. at 1566; Chae Chan Ping v. United States, 130 U.S. 581, 603–10, 9 S.Ct. 623, 629–31, 32 L.Ed. 1068, 1074–77 (1899). The Supreme Court recently held that the due process clause imposes a fair-procedure requirement on the exclusion of resident aliens returning from abroad. Landon v. Plasencia, —— U.S. ——, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). The decision left undisturbed, however, the Court's resolve not to interfere with substantive immigration policies adopted by Congress, regardless of community ties developed by affected aliens. Id. 103 S.Ct. at 330. But see Developments in the Law—Immigration Policy and the Rights of Aliens, 96 Harv.L. Rev. 1286, 1329 (1983) (resident alien's interest in remaining in the United States should subject deportation to substantive due-process scrutiny).

**17.** Exec. Order No. 11,246, 30 Fed.Reg. 12,319 (1965), reprinted in 42 U.S.C. § 2000e app. at 1232–36 (1976); Exec. Order No. 11,478, 34 Fed.Reg. 12,985 (1969), reprinted in 42 U.S.C. § 2000e app. at 1236 (1976).

**18.** 42 U.S.C. §§ 2000e to 2000e–17 (1976 & Supp. V 1981).

**19.** The exclusion is the fourth in a list of seven medical bases for exclusion:

(1) Aliens who are mentally retarded;
(2) Aliens who are insane;
(3) Aliens who have had one or more attacks of insanity;
(4) Aliens afflicted with psychopathic personality, sexual deviation, or a mental defect;
(5) Aliens who are narcotic drug addicts or chronic alcoholics;
(6) Aliens who are afflicted with any dangerous contagious disease;
(7) Aliens not comprehended within any of the foregoing classes who are certified by the examining surgeon as having a physical defect, disease, or disability, when determined by the consular or immigration officer to be of such a nature that it may affect the ability of the alien to earn a living . . . .

8 U.S.C. § 1182(a) (1976).

Section 1182(a) then enumerates 26 other classes of excludable aliens, e.g., persons who have been convicted of a crime involving moral turpitude, polygamists, prostitutes, and anarchists. None of these classes is a medical basis for exclusion.

**20.** Report of the Public Health Service on the Medical Aspects of H.R. 2379, A Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality, and for Other Purposes, reprinted in 1952 U.S.Code Cong. & Ad.News 1653, 1700.

In its report on the House bill that became the 1952 Act, the Public Health Service stated:

thereafter, Public Health Service medical officers issued certificates declaring that aliens were excludable for homosexuality as well as for the other conditions listed in the part of the statute dealing with medical conditions.

The Surgeon General announced in 1979 that the PHS would no longer consider homosexuality a mental disease or defect because current medical standards classify homosexuality as simply a form of sexual behavior, not by itself a psychotic disorder, and because the determination that a person engages in homosexual activities is not made through a medical, diagnostic procedure.[21] Therefore, he advised INS officers to stop referring aliens to the PHS for mental examinations solely to determine whether they were homosexuals.[22]

The Act provides that arriving aliens may be detained at the border while immigration and medical officers examine them for "physical and mental defects or disabilities" that warrant exclusion.[23] It also requires that the physical and mental examination

> In some instances considerable difficulty may be encountered in substantiating a diagnosis of homosexuality .... Ordinarily, a history of homosexuality must be obtained from the individual, which he may successfully cover up. Some psychological tests may be helpful in uncovering homosexuality of which the individual, himself, may be unaware. At the present time there are no reliable laboratory tests which would be helpful in making a diagnosis.
> Report of the Public Health Service on the Medical Aspects of H.R. 2379, A Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality, and for Other Purposes, *reprinted in* 1952 U.S.Code Cong. & Ad.News 1653, 1701.

**21.** Memorandum from Julius Richmond, Surgeon General and Assistant Secretary for Health, United States Department of Health, Education, and Welfare, to William Foege and George Lythcott (Aug. 2, 1979), *quoted in* Memorandum Opinion for the Acting Commissioner, Immigration and Naturalization Service, No. 79-85, 3 Op. Office of Legal Counsel 457, 458 (1979).

**22.** The Justice Department's Office of Legal Counsel rendered an opinion that the Surgeon General lacked authority to take this step. Memorandum Opinion, *supra* note 21, at 458. This has not apparently altered the Surgeon General's position.

of arriving aliens be conducted by medical officers of the United States Public Health Service or if PHS officers are unavailable, by civil surgeons employed on terms prescribed by the Attorney General.[24] These physicians "shall conduct all medical examinations and shall certify, for the information of the immigration officers and the special inquiry officers, any physical and mental defect or disease observed by such medical officers in any such alien." [25]

Longstaff urges the court to infer from the use of the word "shall" that an applicant may not be excluded for medical reasons unless the basis for exclusion is determined by a physician. He supports this argument by reference both to the past administrative practice and to the Act's declaration that a medical certificate is conclusive evidence of medical excludability.[26] Accordingly, he argues, a medical certificate is the sole type of evidence an immigration judge may consider.[27] He adds that the 1917 Act, which the 1952 Act replaced, was also construed to give conclusive effect to a medical certificate of excludability.[28]

**23.** 8 U.S.C. § 1222 (1976).

**24.** *Id.* § 1224 (Supp. V 1981).

**25.** *Id.* The "special inquiry officers" are now immigration judges.

**26.** 8 U.S.C. § 1226(d) (1976) provides:
> If a medical officer or civil surgeon or board of medical officers has certified ... that an alien is afflicted ... with any mental disease, defect, or disability which would bring such alien within any of the classes excluded from admission to the United States under paragraphs (1) to (4) or (5) of section 1182(a) of this title, *the decision of the special inquiry officer shall be based solely upon such certification. No alien shall have a right to appeal from such an excluding decision of a special inquiry officer.*
> (Emphasis added.) *See United States ex rel. Wulf v. Esperdy,* 277 F.2d 537, 538–39 (2d Cir.1960) (per curiam).

**27.** *Cf., In Re Hollinger,* 211 F.Supp. 203, 206 (E.D.Mich.1962) (medical certificate is only evidence on which a finding of insanity may be made in an exclusion proceeding) (dictum).

**28.** *United States ex rel. Johnson v. Shaughnessy,* 336 U.S. 806, 809, 69 S.Ct. 921, 923, 93 L.Ed. 1054, 1056–57 (1949) (medical certificate

To evaluate this argument, we examine the history and structure of the Act and the procedure that must be followed by an alien who seeks to immigrate to the United States.

## IV.

Homosexuals were first statutorily excluded from entry by the Immigration Act of 1917, which prohibited the admission of "persons of constitutional psychopathic inferiority" certified by a physician to be "mentally ... defective." [29] The Immigration and Nationality Act of 1952, which repealed the 1917 Act, excluded homosexuals from entry as persons with "psychopathic personality." [30] In 1965, shortly before Longstaff was admitted, the Act was amended to delete the word "epilepsy," which had previously been included in clause (4), and to substitute "sexual deviation." *See supra* note 8. That clause, as amended, excluded "[a]liens afflicted with psychopathic personality, sexual deviation, or a mental defect" [31] at the time of Longstaff's admission, as it now still does.

When a visa was issued to Longstaff, the procedure employed, which appears not to have changed substantially, was as follows: an alien seeking admission for permanent residence in the United States was required to apply to a consular official outside of the United States for a visa. Issuing visas was the responsibility of the State Department, while examining aliens for admissibility to

the United States was the duty of the INS, an arm of the Justice Department. Before the consular officer could issue the visa, the alien was required to complete an application form and to submit to physical and mental examination by a PHS officer or a designated physician. [32]

The consular officer was forbidden to issue a visa if it appeared from statements in the alien's application or from the papers submitted with it that the alien was ineligible to receive a visa, hence excludable, or if the consular officer knew or had reason to believe that this was the case. [33] Thus, in the usual course of events, an alien who was excludable never received a visa. Presumably, if an applicant for a visa answered "yes" to the psychopathic personality question, he would be denied a visa. If he answered "no" but were found by the PHS officer conducting the pre-visa physical and mental examination to have such a personality, he would also be denied a visa.

Because the immigrant visa was valid for only four months, [34] the PHS officer at the port of entry usually did not make another physical or mental examination. Unless there was some reason to suspect that the alien had suffered a change in health or that the prior examination was erroneous, the domestic PHS officer merely reviewed the medical report attached to the visa. [35] An immigration officer inspected the visa and determined whether the alien was to be

conclusive on issue of excludability as mentally defective); *United States ex rel. Saclarides v. Shaughnessy,* 180 F.2d 687, 688 (2d Cir.1950) (same).

**29.** Ch. 29, § 3, 39 Stat. 874 (1917) (repealed 1952).

**30.** Immigration and Nationality Act, § 212(a)(4), 66 Stat. 163 (1952).

**31.** 8 U.S.C. § 1182(a)(4) (1976).

**32.** *Id.* § 1201(d) (1976); 22 C.F.R. § 42.113 (1982); *see* 1A C. Gordon & H. Rosenfield, *supra* note 12, at § 3.7(g); E. Harper & R. Chase, Immigration Laws of the United States § 6(a) (3d ed. 1975).

If the alien is retarded, insane, afflicted with psychopathic personality, sexual deviation, or a

mental defect, is a drug addict or chronic alcoholic, or is afflicted with a dangerous contagious disease, the physician must issue a Class A medical certificate. 42 C.F.R. § 34.7 (1981). The consular officer must refuse the visa if the examining physician issues a Class A certificate. E. Harper & R. Chase, *supra,* at § 6(b).

**33.** 8 U.S.C. § 1201(g) (1976).

**34.** 8 U.S.C. § 1201(c) (1976).

**35.** If an alien who had received a visa was re-examined upon arrival in the United States and the PHS officer concluded that the applicant suffered from a mental or physical defect, the officer certified these findings in a Class A certificate to the immigration officer. 8 U.S.C. § 1224 (Supp. V 1981). This certificate constituted the evidentiary basis for exclusion at the exclusion hearing. *Id.* § 1226(d) (1976).

admitted.[36] Unless his decision was challenged by another immigration officer, the alien was admitted. The immigration officer might require the alien's sworn statements and other evidence regarding "any matter which is material and relevant to the enforcement of [the Act]," including the production of books, papers, and documents; and the testimony, under subpoena, of witnesses.[37] Any alien who "may not appear to the examining immigration officer at the point of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by [an immigration judge]."[38] That judge made the decision concerning admission.[39]

Former INS immigration officers testified that, because of the procedure for issuing visas, they made no inquiry about the sexual preference of aliens arriving with a visa.[40] One former immigration officer testified that they spent an average of only 38 seconds examining each alien and his papers and that ordinarily the PHS officers merely inspected the pre-visa medical certificate to be certain that it was in order.

There is no evidence in the record regarding the procedure followed when an alien who arrived in the United States with a visa affirmatively disclosed at that time that he was a homosexual. Presumably, such a person would have been referred to a PHS medical officer for a determination of his admissibility.

As Longstaff asserts, the statute provides that the medical officer's certification of "any mental disease, defect, or disability which would bring such alien within any of the classes excluded from admission" is conclusive evidence of excludability.[41] This does not necessarily mean, however, that the absence of certification is conclusive evidence of admissibility. The Act also requires that medical officers be provided with suitable facilities for the detention and examination of all arriving aliens who are suspected of being excludable on the basis of physical or mental condition.[42] But this does not necessarily mean that such an examination is ordinarily conducted or that aliens may be excluded for medical reasons only after such an examination.

Apparently the administrative practice has been to exclude for homosexuality only those persons for whom a certificate was issued.[43] Longstaff's position that no person may be excluded absent such a certificate is also supported by *Lesbian/Gay Freedom Day Committee, Inc. v. Immigration & Naturalization Service,* 541 F.Supp. 569,

**36.** *Id.* § 1225.

**37.** *Id.* § 1225(a).

**38.** *Id.* § 1225(b).

**39.** *Id.* § 1226.

**40.** The Office of Legal Counsel stated in an opinion, "Since 1952, the exclusion of homosexual aliens has been enforced both unilaterally by the INS, e.g., *relying on an alien's admission of homosexuality,* and jointly, subsequent to a certification by the PHS that particular aliens are afflicted with a 'mental defect or disease,' i.e. homosexuality." 3 Op. Office of Legal Counsel 457 (1979) (emphasis added). *The factual recitals in this opinion are not a proper subject of judicial notice.* However, even in this opinion, which is relied upon by the government, there is no indication that the INS initiated any inquiry into or examination for homosexuality.

**41.** 8 U.S.C. § 1226(d) (1976).

**42.** *Id.* § 1224 (Supp. V 1981).

**43.** See, for example, the following cases in which the INS required a medical examination and certification prior to exclusion. *In re Beaton,* No. A–2–486–963 (January 16, 1943); *In re Lionel Colin Roberts,* No. A–12–463–838 (May 20, 1964); *In re Anonymous,* No. A–11–065–813 (June 6, 1964); *In re Jose Luis Hernandez-Gutierrez,* No. A–12–633–815 (July 29, 1964); *In re Norman David Flight,* No. A–12–944–125 (September 1965); *In re Caydem,* 12 I & N Dec. 528 (1967); *In re Johan Baptist Berger,* No. A–10379108–New York (July 12, 1967); *In re Antony Denis Hayes,* No. A–12402065–Boston (March 14, 1968).

General Counsel for the INS, David Crosland, stated in a memorandum dated February 15, 1979, to INS Commissioner Leonel Castillo, C.O. 212.3–C, 212.25–C,

Moreover it appears to us that every alien who is suspected of being a homosexual, and certainly this would include an individual who makes such a declaration [admission of being a homosexual] to an immigration officer, must be referred to a medical officer of the Public Health Service for examination before he may be excluded on that ground.

577–80 (N.D.Cal.1982), *affirmed,* 714 F.2d 1470 (9th Cir.1983).

Evaluating the extent to which this customary procedure establishes a binding precedent, we look to the statute. The *Boutilier* Court inferred from the statute clear congressional intent to exclude persons who are homosexuals at the time they seek entry into the United States. Even if we were not bound by *Boutilier,* Congress declared its intention unmistakeably by amending the statute to bar "sexual deviates." We need not search committee reports or read legislative debates to learn the congressional mandate. The one question that remains is whether Congress ordered the exclusion of everyone it considered sexual deviates or only persons so classified at any given time by the PHS medical officer or some other physician.

If only certification of homosexuality by a medical officer could warrant exclusion of homosexuals, then the Surgeon General would have effectively checkmated Congressional policy. Confronted with the problem raised by the Surgeon General's abdication of the power he had sought from Congress, the INS initially allowed all suspected homosexuals to enter the United States under parole status while it sought counsel from the Justice Department's Office of Legal Counsel on whether it was still obligated to exclude homosexuals.[44] The Office of Legal Counsel informed the INS that it was still required to do so.[45] The opinion of the Ninth Circuit in *Lesbian/Gay Freedom Day Committee, supra,* reads the Act as requiring it to do so only when homosexuality is certified by a medical officer. Because the statute requires

medical examination to be conducted by medical officers of the Public Health Service, the Surgeon General's refusal to allow these officers to make such certification precludes the exclusion of anyone for homosexuality. We cannot, however, conclude that a medical certificate was indispensable to bar a professed homosexual from entry to the United States in 1965 or that obtaining such a certificate now is a prerequisite to denying naturalization.

Although the term "homosexual" is not a scientific designation, and studies indicate that many males have homosexual experiences, there can be no doubt that Longstaff both knew what the term meant and was not uncertain about his sexual preferences. He stated that he had been a homosexual "as far back as [he could] remember in [his] life." He testified that he had engaged in "homosexual activities" before his entry into the United States. He defined a homosexual experience as "going to bed with a person of the same sex, . . . in other words, sexual relations." He admitted having "deviate sexual intercourse" as defined in the Texas statute "at least a dozen times in the State of Texas." He had previously lived in Oklahoma and said he had "committ[ed] homosexual activity in Oklahoma." When asked "when did you first enter into such activities?" he answered, "I've always been a homosexual, . . . from birth." He considers himself "now a known homosexual in the community."[46]

■ A certificate that an alien is suffering from a medical condition that requires him to be excluded is conclusive. *See, e.g., United States ex rel. Johnson v. Shaughnessy,* 336 U.S. 806, 69 S.Ct. 921, 93 L.Ed. 1054

---

**44.** N.Y. Times, August 15, 1979, at A 14, col. 1.

**45.** Memorandum Opinion, *supra* note 47, at 458; *see also* Note, *The Immigration and Nationality Act and the Exclusion of Homosexuals:* Boutilier v. INS *Revisited,* 2 Cardozo L.Rev. 359 (1981).

**46.** *Cf. LaVoie v. INS,* 418 F.2d 732, 734 (9th Cir.1969), *cert. denied,* 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970).

The Boutilier case is controlling in the case before us. In both, the person ordered to be deported had frequently, over a period of years before entry engaged in homosexual

acts. Each was a person who, in common opinion, would be regarded as a homosexual. The fact that one or more psychiatrists might regard such a person as having "character disorder, psychopathic or otherwise" as the petitioner's psychiatrist testified, or that another psychiatrist might regard such a person as not necessarily a homosexual, but as a sexual deviate, as the Service's psychiatrist testified, are both irrelevant, in view of the meaning which the Supreme Court in Boutilier gave to the pertinent statute.

*Id.* at 736.

(1949); *United States ex rel. Wulf v. Esperdy,* 277 F.2d 537 (2d Cir.1960). The statute and these decisions might well lead to the conclusion that a medical determination by a PHS officer that the alien is not suffering from such a condition is also conclusive. But neither the premise nor the inference leads to the conclusion that non-excludability is conclusively established by the absence of any examination at all.

■ The procedural protections built into the exclusion process demonstrate Congress's intent that only competent evidence of medical excludability be adduced in exclusion proceedings. But there is no reason why an informed applicant's admission that he falls within an excludable class is not competent evidence on which to base an exclusion decision. Section 1226(d) of the United States Code is not to the contrary. That section specifies that, if an immigration judge in an exclusion hearing is presented with a medical certificate "that an alien is afflicted ... with any mental disease, defect, or disability," his decision "shall be based solely on such certification." It merely makes clear that the petitioner has no right to introduce evidence rebutting the certificate.[47] It does not expressly forbid an immigration judge to find an applicant excludable on the basis of evidence other than a medical certificate.

Although in *Boutilier,* the Public Health Service had issued a class A medical certificate stating that in the opinion of the subscribing physicians the petitioner "was afflicted with a class A condition, namely, psychopathic personality, sexual deviate" at the time of his admission, there is no indication in the opinion that the INS would have been required to ignore an admission by Boutilier that he was a homosexual. *Boutilier v. INS,* 387 U.S. at 120, 87 S.Ct. at 1565, 18 L.Ed.2d at 664. Likewise in *Kovacs,* the Second Circuit noted that a medical certificate had been prepared. *Kovacs v. United States,* 476 F.2d 843, 844 n. 1 (2d Cir.1973). These decisions indicate only that, in the past, after an alien has been admitted, the INS has obtained a class A certificate as a means of proving deportability. They do not establish that the certificate is indispensable.

To remand the case for a medical determination of homosexuality would appear to be to ask for a certification of the obvious. It is patent that sexual preference cannot be determined by blood test or physical examination; even doctors must reach a decision by interrogation of the person involved or of others professing knowledge about that person. To require the INS to disregard the most reliable source of information, the statements of the person involved, would be to substitute secondary evidence for primary.

■ Longstaff contends alternatively that the fact that he was admitted to the United States bars inquiry into his excludability eighteen years ago. This argument will not bear scrutiny. As Longstaff concedes, a previously admitted alien may be deported if it is determined that he should have been excluded on any of the numerous nonmedical bases stated in the Act, such as criminal conviction or anarchy.[48] He asserts, however, that the PHS officer's failure to detect an excluding mental or physical condition is definitive.

Administrative practice and judicial precedent both disclose the error of this argument. In *Boutilier,* for example, the question of excludability for homosexuality arose nine years after the alien's admission. In numerous other cases, aliens have been deported on the basis of post-admission determinations that they should have been excluded because of physical or mental

---

47. *See* cases cited in *supra* note 24.

48. *Accord Alarcon-Baylon v. Brownell,* 250 F.2d 45 (5th Cir.1957) (government not estopped from deporting petitioner as draft evader, even though it issued him visa to enter as permanent resident following his draft evasion); *Santiago v. Immigration & Naturalization Service,* 526 F.2d 488 (9th Cir.1975) (en banc) (government not estopped from deporting petitioners who entered United States on visas valid if they were "accompanying, or following to join" spouses or parents who, in fact, did not enter United States), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). *See generally* Annot., 31 A.L.R.Fed. 900 (1977).

problems.[49] The Ninth Circuit affirmed an order of deportation based on petitioner's admissions and conflicting testimony of two psychiatrists because the alien was a homosexual when admitted from Canada in *La-Voie v. Immigration and Naturalization Service,* 418 F.2d 732 (9th Cir.1969), *cert. denied,* 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970). We affirmed a deportation order based on an alien's homosexuality without making clear whether she had been certified as a homosexual when admitted in *Quiroz v. Neelly,* 291 F.2d 906 (5th Cir. 1961). In several cases, the sufficiency of the evidence at a deportation hearing has been questioned.[50] To reach that question, the Board of Immigration Appeals and various courts had to assume that an alien's admissibility at the time of entry may be reconsidered.

In considering appeals from deportation orders issued on the basis of a charge that the alien was a homosexual when admitted,

the Board of Immigration Appeals has remanded cases for a medical determination, stating that neither the immigration judge nor the Board has "the expertise or the authority" to determine medical admissibility.[51] In all of these appeals the grounds for medical excludability were disputed. If the alien admits the facts determining his excludability, the Board, other immigration officials, and the courts may assuredly act on the basis of that admission.[52]

In response to the refusal of the PHS to make medical determinations of homosexuality and the determination of the office of legal counsel that the INS was nonetheless obliged to exclude homosexuals, the INS has adopted a new policy, "Guidelines and Procedures for the Inspection of Aliens Who Are Suspected of Being Homosexual."[53] This statement provides that an arriving alien will not be asked any questions regarding his sexual preference.[54] If an

**49.** *Canciamillia v. Haff,* 64 F.2d 875 (9th Cir. 1933) (epilepsy); *In re Vallejos,* 14 I. & N.Dec. 68 (1972) (leprosy); *In re A,* 8 I. & N.Dec. 12 (1958) (previous insanity); *see also In re La-Rochelle,* 11 I. & N.Dec. 436, 438 (1965) (Congress intended to make deportable those who were medically inadmissible at time of entry, but who nevertheless succeeded in entering United States).

**50.** *See, e.g.,* cases cited in *supra* note 43 and in *infra* note 52.

**51.** *In re Caydam,* 12 I. & N.Dec. 528, 533 (1967). *See also In re Roberts,* No. A12–463–838 (May 20, 1964); Legal Opinion No. 79–7 of INS General Counsel to INS Commissioner, C.O. 212.3–C, 212.25–C. Support for this view can also be found in *LeBlanc v. Bouchard,* No. 1308–58 (D.N.J.1959) (unreported); *In re Hollinger,* 211 F.Supp. 203 (E.D.Mich.1962) (determination of insanity).

In *United States ex rel. Johnson v. Shaughnessy,* 336 U.S. 806, 814, 69 S.Ct. 921, 925, 93 L.Ed. 1054, 1059 (1949), the Court stated:

The ... regulations plainly prohibit the issuance of exclusion orders resting on nothing but a single episode reported by a non-Public-Health doctor. Congress has provided that before aliens suspected of mental defects are excluded, findings and conclusions shall be made by Public Health doctors based on their own examinations made in compliance with procedural safeguards defined or authorized by Congress. Medical certificates barring aliens are even then to be issued "only if

the presence of such ... defect is clearly established." (Citation omitted.)

**52.** *In re LaVoie,* 12 I. & N.Dec. 821 (1968), *aff'd sub nom. LaVoie v. Immigration & Naturalization Service,* 418 F.2d 732 (9th Cir.1969), *cert. denied,* 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970) (LaVoie's admission of homosexuality at time of entry meets *Woodby v. Immigration and Naturalization Service,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), standard that ground for deportation must be proved by clear, convincing, unequivocal evidence); *In re Steele,* 12 I. & N.Dec. 302 (1967) (sustaining deportation order on ground that Steele excludable as homosexual at time of entry; to prove excludability at time of entry, INS relied on Steele's statements that he had then been homosexual); *In re LaRochelle,* 11 I. & N.Dec. 436 (1965) (LaRochelle's post-entry admission of homosexuality at time of entry supports deportation order; Board does not require medical certificate in deportation proceeding). *See also In re S,* 8 I. & N.Dec. 409 (1959) (PHS officer certified S as homosexual based on post-admission interview in which S admitted homosexuality and commission of homosexual acts); *In re P,* 7 I. & N.Dec. 258 (1956) (same).

**53.** Press Release of the Department of Justice (Sept. 9, 1980). *See also* 1A C. Gordon & H. Rosenfield, *supra* note 12, § 2.38(b)(1) at 102–03 (Supp.1983) (description of guidelines).

**54.** The Application for Immigrant Visa and Alien Registration currently in use asks the

alien "makes an unambiguous oral or written admission of homosexuality" (which does not include exhibition of buttons, literature, or other similar material), or if a third person who is also presenting himself for inspection "voluntarily states, without prompting or prior questioning, that an alien who arrived in the United States at the same time . . . is a homosexual," the alien may be examined privately by an immigration officer and asked to sign a statement that he is a homosexual. That statement forms the evidentiary basis for exclusion.

Thus, the administrative agency charged with enforcement of the Act has interpreted it as not requiring a medical certificate as a condition for the exclusion of homosexuals. This interpretation is entitled to deference.[55]

■ That homosexuality is no longer considered a psychopathic condition is established by the opinion of the government's highest medical officer, the Surgeon General. We are bound, nonetheless, by *Boutilier*'s ruling that the phrase "psychopathic personality," is a term of art, not dependent on medical definition,[56] and by the congres-

---

applicant whether the excludable condition of sexual deviation, *inter alia*, "applies" to him and, if so, to explain. The pertinent question reads:

United States laws governing the issuance of visas require each applicant to state whether or not he or she is a member of any class of individuals excluded from admission into the United States. The excludable classes are described below. You should read carefully the following paragraphs; your understanding of their content and the answers you give the questions that follow will assist the consular office to reach a decision on your eligibility to receive a visa.
EXCEPT AS OTHERWISE PROVIDED BY LAW, ALIENS WITHIN ANY OF THE FOLLOWING CLASSES ARE INELIGIBLE TO RECEIVE AN IMMIGRANT VISA:
(a) Aliens who are mentally retarded, insane, or who have suffered one or more attacks of insanity; aliens afflicted with psychopathic personality, sexual deviation, a mental defect, narcotic drug addiction, chronic alcoholism, or any dangerous contagious disease; aliens who have a physical defect, disease, or disability affecting their ability to earn a living; aliens who are paupers, professional beggars, or vagrants; aliens convicted of a crime involving moral turpitude or who admit committing the essential elements of such a crime, or who have been sentenced to confinement for at least 5 years in the aggregate for conviction of two or more crimes; aliens who are polygamists, or who practice or advocate polygamy; aliens who are prostitutes, or who have engaged in, benefited financially from, procured, or imported persons for the purpose of prostitution, or who seek entry to the United States to engage in prostitution or other commercialized vice, or any immoral sexual act; aliens who seek entry to perform skilled or unskilled labor and who have not been certified by the Secretary of Labor; and aliens likely to become a public charge in the United States.
Do any of the foregoing classes apply to you?
Yes ____ No ____ (If answer is Yes, explain)

**55.** *See Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); *Kaneb Services, Inc. v. Federal Savings & Loan Insurance Corp.,* 650 F.2d 78, 83 n. 13 (5th Cir.1981); K. Davis, Administrative Law Treatise § 29.00–6 (1982 Supp.).

**56.** Judge Aguilar concluded in *Lesbian/Gay Freedom Day Committee, Inc.,* 541 F.Supp. at 585, that, "*Boutilier* does not preclude the Court from finding that Congress did not intend that homosexuals be excluded from entry into the United States solely because they are homosexuals once medical authorities have determined that homosexuality is not a medical illness, mental disorder, or sexual deviation, and the Court so finds this to be the congressional intent." We disagree with this interpretation of *Boutilier* and of Congressional intent. *Quiroz v. Neelly,* 291 F.2d 906, 907 (5th Cir.1961). Like the Supreme Court, we look behind the technical phrases in the Act to the purpose of its drafters. Congress clearly intended to exclude homosexuals from entry into the United States and its use of medical language to describe the excludable class was not intended to lay down a clinical test for exclusion, dependent on the vicissitudes of medical opinion. *Boutilier,* 387 U.S. at 122, 87 S.Ct. at 1566, 18 L.Ed.2d at 665. Indeed, although Congress employed medical terminology to describe the excludable class, it is evident that moral as well as medical reasons underlay the congressional decision to exclude homosexuals. *Developments in the Law—Immigration Policy and the Rights of Aliens,* 96 Harv.L.Rev. 1286, 1346 & nn. 92–94 (1983). Nor do we agree with Judge Aguilar that Congress's decision is subject to constitutional challenge. 541 F.Supp. at 585 n. 8. The Constitution vests in Congress—not the courts—plenary decisionmaking authority over the admission of aliens into the United States. Congress's decision that a class of aliens is excludable is not reviewable by the judicial branch. *Fiallo,* 430 U.S. at 792 & n. 4, 97 S.Ct. at 1478 & n. 4, 52 L.Ed.2d at 56 & n. 4.

sional bar against persons "afflicted with ... sexual deviation." Homosexuality can now be demonstrated in INS proceedings only by an alien's unambiguous admission or by the voluntary statement of a third person, made without either prompting or questioning. Longstaff is thus barred from naturalization by his own truthful statements that he was excludable as a homosexual at the time of his entry, and, therefore, was not lawfully admitted for permanent residence.[57] There is no evidence that, when he sought a visa eighteen years ago, he was asked any question that would indicate to him or to any other intelligent layman that his sexual preferences might affect the issuance of a visa, or that he knowingly gave a false answer to any question asked of him. In the eighteen years of his residence, he has led a constructive life. We are, however, bound to decide according to a law made in the exercise of a power that is plenary. If Congress's policy is misguided, Congress must revise that policy. If the result achieved by the policy is unfair to a deserving person who desires to become a citizen, the injustice must be corrected by lawmakers.

Based on the finding that Longstaff was a homosexual when he entered the United States, the district court correctly decided that he was then excludable, that his excludability may now be proved, and that,

being excludable, he may not be naturalized.[58] Therefore, its judgment is AFFIRMED.

TATE, Circuit Judge, dissenting:

The majority has certainly reached a logical conclusion, based upon its intelligent analysis of applicable legislation and jurisprudential authority, that the petitioner Longstaff may be denied naturalization in 1983 because, when he was admitted to the United States in 1965 (following which he has led a constructive life), he was a homosexual and thus could have been excluded from admission to the United States. The majority therefore concludes that Longstaff was not "lawfully admitted" to the United States, a prerequisite for naturalization.

I respectfully dissent. For the reasons extensively detailed by the Ninth Circuit recently in *Hill v. United States Immigration and Naturalization Service,* 714 F.2d 1470 (9th Cir.1983), I would conclude that a homosexual may not lawfully be denied admission in the absence of a medical certificate to that effect.

I premise my conclusion on the peculiar statutory framework at issue in this case. As the majority states, Congress listed "psychopathic personality" and "sexual deviation" as causes for exclusion in a list of seven medical bases for exclusion. *See,* 8

---

**57.** *In re Jasso,* No. 204019 (N.D.Cal. Oct. 9, 1975) and *In re Brodie,* 394 F.Supp. 1208 (D.Or. 1975) both involved petitions for naturalization under 8 U.S.C. § 1440 (1976 & Supp. V 1981), which waives lawful admission, periods of residency, physical presence, and nondeportability as conditions for naturalization. For this reason, the district courts in *Jasso* and *Brodie* considered only whether the petitioners had met their burden of proving good moral character. Longstaff, however, must meet the lawful-admission and nondeportability requirements. Contrary to our decision, however, is *In re Labady,* 326 F.Supp. 924 (S.D.N.Y.1971). Although Labady had made known to immigration officials at the time of his entry that he was homosexual, he was not medically certified as a "sexual deviate" or a "psychopathic personality." The district court observed, "Since [Labady] validly entered the country without deceit, the Service concedes that he is not now deportable." *Id.* at 926. The court characterized Labady, without discussion, as "lawfully admitted," *id.* at 925, and addressed only the

issue whether Labady had established his good moral character. In dictum, the Second Circuit distinguished *Labady* from the case of a homosexual whose petition for naturalization was denied because he failed to prove good moral character. *Kovacs v. United States,* 476 F.2d 843 (2d Cir.1973). Kovacs had not been candid under oath about his sexual activities. The Second Circuit suggested, "Had Kovacs testified truthfully about his past, the petition might well have been granted." *Id.* at 845 (footnote omitted). Because we interpret the statute as requiring a petitioner for naturalization to have been lawfully admitted, we cannot agree with this suggestion.

**58.** We consider only whether Longstaff was lawfully admitted in 1965; we express no opinion about any matter not raised as an issue in this case. Therefore, we do not expatiate on whether the same result would be statutorily compelled or constitutionally permissible in deportation proceedings, a concern addressed by the dissent.

U.S.C. § 1182(a) (1976). This list of medical causes for exclusion is further supplemented by twenty-six other non-medical bases for exclusion. *Id.* Furthermore, 8 U.S.C. § 1224 provides that either medical officers of the Public Health Service or civil surgeons employed by the United States "*shall*" conduct the physical and mental examination of all aliens suspected of being medically excludable under § 1182(a)(1)–(5), (thus including the grounds of psychopathic personality and sexual deviation). These medical personnel and surgeons are the only persons authorized by the Act to certify the existence of "*any*" medical condition permitting exclusion.[1]

Therefore, the statutory scheme contemplates that medical personnel will diagnose and certify any *medical* cause for deportation or exclusion. Moreover, as the majority concedes, the apparent practice of the Immigration and Naturalization Service (the "INS") has been "to exclude for homosexuality only those persons for whom a [medical] certificate was issued." 716 F.2d 1446.

Nonetheless, the majority concludes that Congress did not intend for a medical certificate attesting to an individual's homosexuality to be the only competent evidence for exclusion on the basis of "psychopathic personality" or "sexual deviation." To the contrary, however, I do not believe that it is overly formalistic to find that Congress did intend in its statutory scheme to *require* medical certification, and only medical certification, of any "medical" cause for exclusion. In this context, it must be remembered that the statute provides that an alien in the United States may be deported if he "at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of [his] entry" into the United States. 8 U.S.C. § 1251(a)(1).

In my view, Congress intended to avoid not only an initial exclusion *from admission*, but also an ex post facto determination for deportation purposes, from being based solely on the non-medical judgment of bureaucratic agencies that a "medical" cause for exclusion existed at the time of a person's admission, when that determination is unsupported by a professional judgment by a member of the medical profession. This interpretation is further supported when, as here, the medical condition is indefinite and arguable (or, *e.g.,* where a condition was latent at the time of entry and undiscoverable *then* by a medical examination); then, medical conditions that allegedly existed at the time of presumably lawful admission could later be administratively misused to deport persons unpopular in actuality for non-medical reasons. Thus, I believe that Congress intended the medical certification procedure to be interposed as an important safeguard against abusive "medical" exclusions or deportations by introducing the independent factor of a professional medical examination into this aspect of the exclusion and deportation process.

Nor does my reading of Congress' intent differ because homosexuality is no longer recognized by medical experts to be a psychopathic condition. As the majority notes, we are bound by the Supreme Court's ruling in *Boutilier v. Immigration and Naturalization Service,* 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967), to the effect that homosexuality is a "medical" condition then included within the phrase "psychopathic personality." *Id.* And since this ruling is apparently not dependent on current medical opinion, *Boutilier, supra,* 387 U.S. at 124, 87 S.Ct. at 1567, I can see no reason to treat homosexuality differently from the other grounds for medical exclusion.

---

**1.** § 1224 of the Act provides that:

The physical and mental examination of arriving aliens (including alien crewmen) shall be made by medical officers of the United States Public Health Service, who shall conduct all medical examinations and shall certify, for the information of the immigration officers and the special inquiry officers,

any physical and mental defect or disease observed by such medical officers in any such alien. If medical officers of the United States Public Health Service are not available, civil surgeons of not less than four years' professional experience may be employed for such service upon such terms as may be prescribed by the Attorney General. * * *

Thus, exclusion or deportation on grounds of homosexuality must be subject to the same safeguards of medical certification as exclusion or deportation on other medical grounds such as "mental retardation" or "mental defect." Just as Congress was unwilling to rely on a bureaucratic determination that a person has a "mental defect",[2] the *statute* clearly suggests that Congress was equally unwilling to accept a non-medical determination that a person has a "psychopathic personality" because of homosexuality (the test of lawful admission at the time of Longstaff's entry). The importance of adhering to the congressional intent that only professional medical determinations be made, so as to avoid the improper non-medical administrative classification of a person as "medically" excludable or deportable, requires that the courts respect these stringent statutory standards by not creating procedural exceptions only for certain "medical" conditions.

The INS argues that it should not be required to produce medical certification of homosexuality for exclusion or deportation purposes since such certification is now difficult to obtain. In particular, the INS contends that it should be allowed to rely on other forms of evidence under the statute, because the PHS, pursuant to an order by the Surgeon General, has refused since 1979 to medically diagnose and certify that an individual is a homosexual.

It is basic, however, that this court is without authority to ignore the mandate of Congress' statutory scheme merely because there is an interagency dispute over the mechanics of statutory enforcement. If this administrative dispute renders the exclusion of homosexuals under the statute ineffective, then it is for Congress, not this court, to alter its statutory scheme requiring medical certification. Absent such congressional intervention, I am unwilling to infer that Congress intended to allow the non-medical personnel of an administrative

agency to use "medical" classifications—as is the practice in present-day Russia—to exile persons for newly-discovered mental defects or other "medical conditions."

Thus, I agree with the Ninth Circuit in *Hill, supra,* that Congress did so intend to treat medical causes for exclusion or deportation differently from non-medical causes for denial of lawful admission to the United States, and that we must respect the intended illogic of Congress in according such talismanic significance to the presence or absence of a conclusive medical certification as determinative of admissibility or deportability.

One final word. The issue before us appears to be simply whether or not the petitioner Longstaff is entitled to naturalization. As the authorities cited by the majority show, however, if the majority's reasoning is correct, not only is naturalization deniable to Longstaff, but also Longstaff is subject to deportation many, many years after his presumably lawful entry to the United States and his constructive life here.

Of far greater importance than Longstaff's unfortunate individual plight, and the rather simple factual issues presented by it, is the subjection to deportation of all other persons against whom a governmental agency may assert as a reason for deportation—perhaps (as in the case of Longstaff) many years after presumably lawful entry into the United States—a newly discovered pre-admission "medical" cause for exclusion from entry. This is especially troublesome when the medical condition is one in the diagnosis of which medical experts may differ, and in which medical "diagnosis" as to whether or not the condition existed at time of entry may be wholly speculative. The continued stay in the United States as a resident alien of an individual such as Longstaff (and his eligibility for naturalization) is thus made dependent on the uncertainties and indefiniteness of medical science (as hypothesized by

---

**2.** No more, I believe, did Congress intend to allow agents of the Immigration and Naturalization Service to exclude or deport aliens solely on the basis of a self-admission that "I have a mental defect" or "I have had an attack of insanity" or "I am a moron", which are some of the other causes for medical exclusion under

the Act. Under the statutory scheme, Congress simply did not intend to permit a non-medical determination as to the existence of "medical" causes for exclusion or deportation, including "psychopathic personality" and "sexual deviation."

medical and psychiatric expert witnesses) as to a "medical" condition and whether it existed or not at the time of entry.

This spectre, and the avoidance of the possibility of abuse of bureaucratic deportation powers, is what I believe the Congress intended to avoid by conclusively fixing a professionally certified medical cause for exclusion from lawful admission by the showing made as to it at the time of admission to the United States.