**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SAMUEL APPIAH,
Petitioner,

v.

No. 97-1705

U.S. IMMIGRATION & NATURALIZATION
SERVICE,
Respondent.

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A72-783-301)

Argued: December 3, 1999

Decided: January 20, 2000

Before WILKINSON, Chief Judge, KING, Circuit Judge,
and BUTZNER, Senior Circuit Judge.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge King and Senior Judge Butzner joined.

_____

**COUNSEL**

**ARGUED:** Randall Lee Johnson, JOHNSON & ASSOCIATES,
Arlington, Virginia, for Petitioner. Ethan B. Kanter, Office of Immi-
gration Litigation, Civil Division, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Respondent. **ON
BRIEF:** David W. Ogden, Acting Assistant Attorney General,
Michael P. Lindemann, Assistant Director, Office of Immigration Lit-

igation, Civil Division, UNITED STATES DEPARTMENT OF JUS-TICE, Washington, D.C., for Respondent.

_____

**OPINION**

WILKINSON, Chief Judge:

Samuel Appiah, a citizen of Ghana illegally residing in the United States, seeks to suspend his deportation. In order to be eligible for a suspension of deportation, an alien must show a continuous physical presence in the United States for seven years. Suspension then rests in the discretion of the Attorney General. While Appiah's deportation proceedings were pending, Congress enacted a new stop-time rule for calculating the required period of continuous physical presence. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 309(c)(5), 110 Stat. 3009-546. Appiah argues that applying this new stop-time rule to his case would have an impermissible retroactive effect and would violate his due process and equal protection rights. The Board of Immigration Appeals dismissed Appiah's claims because under the new rule he had failed to accrue the necessary seven years of continuous physical presence. We now affirm.

I.

Samuel Appiah entered the United States on June 9, 1987, as a non-immigrant student with authorization to remain for a temporary period not to exceed the time of full-time enrollment in school. Appiah violated the terms of his visa by remaining in the United States beyond the time of full-time enrollment without authorization from the Immigration and Naturalization Service (INS). In January 1993, Appiah married Felicia Brown, an American citizen. Ms. Brown filed an immediate relative visa petition on Appiah's behalf, but then later withdrew the petition.

On December 17, 1993, the INS instituted deportation proceedings against Appiah by serving him with an order to show cause why he should not be deported. The order charged Appiah with remaining in the United States longer than permitted.

2

At a December 12, 1994 hearing, Appiah requested suspension of deportation or voluntary departure. The immigration judge denied Appiah's application for suspension of deportation and granted him voluntary departure. The judge found that Appiah had failed to show the extreme hardship necessary for suspension relief. He found that Brown's testimony regarding her marriage to Appiah was vague and unreliable. The judge concluded that Appiah's "relationship with Felicia Brown is sketchy at best," and that his "failure to establish a bona fide relationship with his wife" diminished the hardship of deportation.

Appiah appealed the immigration judge's decision to the Board of Immigration Appeals (BIA). The BIA dismissed the appeal because Appiah had failed to meet the seven years of continuous physical presence in the United States and thus could not be considered for a suspension of deportation. See 8 U.S.C.§ 1229b(a)(2) (Supp. III 1997). The BIA reasoned that because Appiah had entered the United States on June 9, 1987, and was served with the order to show cause on December 17, 1993, he fell short of the seven year requirement. Appiah filed a petition for review in this court.

II.

Appiah challenges the application of the new stop-time rule in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) to his pending deportation proceedings. A brief review of the statutory background is in order.

Prior to 1996, under section 244(a) of the INA the Attorney General could grant suspension of deportation to an alien. See 8 U.S.C. § 1254(a) (1994). In order to be eligible for suspension of deportation, an alien had to satisfy several requirements. See id. One such requirement was that the alien be "physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application [for suspension of deportation]."* Id. § 1254(a)(1). Pre-IIRIRA, the time an alien spent in deportation

_____

*The other requirements are not at issue in this case. The statute provides that in addition to the seven years of continuous physical presence, an alien must show that "he was and is a person of good moral character," and that deportation would "result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1254(a) (1994).

3

proceedings counted toward the physical presence requirement. Satisfying the statutory requirements did not entitle an alien to suspension of deportation, but only to a discretionary decision by the Attorney General. See id. § 1254(a).

In 1996, Congress enacted IIRIRA, which aimed to expedite the removal of deportable aliens and to limit discretionary relief. Pub. L. No. 104-208, 110 Stat. 3009-546. IIRIRA section 304(a) repealed the suspension of deportation provision in INA section 244, and replaced it with a new INA section 240A that provides for the"cancellation of removal." 8 U.S.C. § 1229b (Supp. III 1997). Previously deportation proceedings were initiated by an "order to show cause," and now by a "notice to appear." Id. § 1229(a)(1). In addition, IIRIRA section 304(a) enacted a "stop-time" rule for determining an alien's eligibility for suspension of deportation or cancellation of removal. Id. § 1229b(d)(1). Section 304(a) provides that"any period of continuous residence or continuous physical presence shall be deemed to end when the alien is served a notice to appear." Id. After IIRIRA's enactment, the initiation of deportation proceedings stops the clock -- an alien can no longer accrue years of continuous physical presence once proceedings have begun.

Under the effective date provisions of IIRIRA section 309(c)(1), most of the IIRIRA amendments to the INA do not apply to aliens placed in deportation proceedings prior to April 1, 1997. 110 Stat. at 3009-625. Yet IIRIRA section 309(c)(5) provides a special "Transitional Rule with Regard to Suspension of Deportation," which states that the new stop-time rule "shall apply to notices to appear issued before, on, or after the date of the enactment of this Act [Sept. 30, 1996]." 110 Stat. at 3009-627.

Shortly after the enactment of IIRIRA, the BIA found that the new stop-time rule applied to aliens who were in deportation proceedings prior to IIRIRA's enactment. See In re N-J-B, Int. Dec. 3309 (BIA 1997). The BIA interpreted the new phrase "notices to appear" in IIRIRA section 309(c)(5) to include other documents initiating deportation or removal proceedings, including the pre-IIRIRA "orders to show cause." According to In re N-J-B, aliens who failed to accrue the necessary time for continuous physical presence before their deportation proceedings were initiated were now ineligible for a sus-

4

pension of deportation. The Attorney General subsequently vacated the BIA's In re N-J-B opinion, and certified the case to herself for review. This review never occurred, however, because in 1997 Congress passed the Nicaraguan Adjustment and Central American Relief Act (NACARA), which enacted a clarifying amendment. Pub. L. No. 105-100, 111 Stat. 2160.

NACARA amended IIRIRA's stop-time rule by replacing"notices to appear" with "orders to show cause." NACARA § 203(a), 111 Stat. at 2196. NACARA also exempted certain classes of aliens based on their national origin from the new continuous presence rules. The new stop-time rule does not apply to certain groups of nationals from Salvador, Guatemala, the Soviet Union, Russia, any republic of the former Soviet Union, Latvia, Estonia, Lithuania, Poland, Czechoslovakia, Romania, Hungary, Bulgaria, Albania, East Germany, Yugoslavia, or any state of the former Yugoslavia. See NACARA § 203(a), 111 Stat. at 2196-97.

In light of NACARA, the BIA decided that the new stop-time rule applied to all pending deportation proceedings (except for those aliens qualifying for a statutory exemption). See In re Nolasco-Tofino, Int. Dec. 3385 (BIA 1999). The BIA found the language of the new stop-time rule to be "unambiguous." Id.

With this statutory framework in mind, we proceed to consider Appiah's claims.

III.

Appiah contends that the new stop-time rule should not affect his eligibility for a suspension of deportation because this would work an impermissible retroactive application of the law. He further argues that applying the law retroactively violates his due process and equal protection rights under the Fifth Amendment.

A.

We begin with Appiah's statutory challenge. When evaluating a claim of retroactivity, we must first determine whether "Congress has

5

expressly prescribed the statute's proper reach." <u>Landgraf v. USI Film Products</u>, 511 U.S. 244, 280 (1994). If so, this is the end of the analysis and there is no need "to resort to judicial default rules." <u>Id.</u> If the statute is not clear, "the court must determine whether the new statute would have retroactive effect." <u>Id.</u>

In this case, Congress has clearly stated that the stop-time rule applies to pending deportation proceedings. The stop-time rule "shall apply to orders to show cause . . . issued before, on, or after the date of the enactment of this Act." IIRIRA § 309(c)(5)(A), as amended by NACARA § 203(a), 8 U.S.C. § 1101 note (Supp. III 1997) (Effective Date of 1996 Amendments). In a similar case, the Eleventh Circuit noted that NACARA "resolves any potential linguistic ambiguity . . . with respect to the stop-time provision." <u>Tefel v. Reno</u>, 180 F.3d 1286, 1293 (11th Cir. 1999). That court found that "NACARA clarifies that the stop-time provision applies to aliens who were facing deportation and/or had applied for suspension of deportation before IIRIRA's enactment, because it precludes any argument that the reference to `notices to appear' suggested that Congress intended the stop-time rule to apply only to post-IIRIRA removal proceedings, which are initiated with `notices to appear.'" <u>Id.</u>

Moreover, other courts have found identical language in other immigration laws to be facially plain. For example, IIRIRA section 322(c) applies to "convictions . . . entered before, on, or after the date of the enactment of this Act." 110 Stat. at 3009-629. The Fifth Circuit found that "[t]he plain language of § 322(c) leaves no doubt that Congress intended for the definition in § 322(c) to be applied retroactively. Congress could not have more clearly expressed this intent than through its statement that § 322(a) was to apply to convictions entered <u>before</u> the date of IIRIRA's enactment." <u>Moosa v. INS</u>, 171 F.3d 994, 1007 (5th Cir. 1999); <u>accord Feroz v. INS</u>, 22 F.3d 225 (9th Cir. 1994) (explaining that where Congress uses"before, on, or after" language, provision applies to pending cases).

Even if the language were somehow ambiguous, the stop-time rule still has no "retroactive effect" because it does not "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." <u>Landgraf</u>, 511 U.S. at 280. Here, the stop-time provision

6

only limits Appiah's eligibility for discretionary relief -- it does not infringe on a right that he possessed prior to its enactment. A suspension of deportation is "manifestly not a matter of right under any circumstances," because it is an entirely discretionary act. Jay v. Boyd, 351 U.S. 345, 354 (1956).

Appiah may have expected to receive a suspension, but the Court in Landgraf emphasized that a statute does not operate retroactively merely because it "upsets expectations based in prior law." 511 U.S. at 269. As the Court noted, "Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct." Id. at 269 n. 24. The prospect of unsettled expectations, however, is not a reason for declining to apply a statute to a pending case. Like a prisoner waiting for the executive pardon, Appiah could hope for reprieve from deportation, yet hope does not establish a right to relief.

B.

Appiah's due process and equal protection claims also fail because illegal aliens have no vested right in not being deported, and the challenged statutory provisions easily withstand rational basis review.

The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has found equal protection guarantees in the Fifth Amendment as well. See Bolling v. Sharpe, 347 U.S. 497, 499 (1954); Hampton v. Mow Sun Wong, 426 U.S. 88, 100 (1976).

Appiah has given us no reason to apply to his claims anything other than the most deferential standard of review. As an illegal alien he has no right to continue to reside in the United States. Moreover, eligibility for suspension is not a right protected by the Constitution. Suspension of deportation is rather an "act of grace" that rests in the "unfettered discretion" of the Attorney General. INS v. Yueh-Shaio Yang, 519 U.S. 26, 30 (1996) (internal quotation marks omitted). Because suspension of deportation is discretionary, it does not create a protectible liberty or property interest. Indeed, "a constitutionally protected interest cannot arise from relief that the executive exercises unfettered discretion to award." Tefel, 180 F.3d at 1300. This is true

7

even where the state "frequently" has granted the relief sought. See Connecticut Bd. of Pardons v. Dumschat, 452 U.S. 458, 465 (1981).

Moreover, judicial review over federal immigration legislation has always been limited. See Fiallo v. Bell, 430 U.S. 787, 792 (1977). The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." Shaughnessy v. Mezei, 345 U.S. 206, 210 (1953)."The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." Mathews v. Diaz, 426 U.S. 67, 81-82 (1976). In fact, the "constraints of rationality imposed by the constitutional requirement of substantive due process and of nondiscrimination exacted by the equal protection component of the due process clause do not limit the federal government's power to regulate either immigration or naturalization." In re Longstaff, 716 F.2d 1439, 1442-43 (7th Cir. 1983).

The stop-time rule is rationally grounded. Congress enacted the rule to remove an alien's incentive for prolonging deportation proceedings in order to become eligible for suspension. See H.R. Rep. No. 104-469(I) (1996) ("Suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued."). Removing the incentive for delay in the deportation process is a valid government objective, and applying the stop-time rule to aliens such as Appiah who are already in deportation proceedings rationally furthers this purpose.

We finally reject Appiah's contention that NACARA impermissibly created special classes of suspension applicants for whom the old rules still apply. Under IIRIRA section 309(c)(5)(C), as amended by NACARA, aliens from certain countries can still accrue time towards continuous physical residence after being served an order to show cause. Although these provisions differentiate among aliens based on national origin, strict scrutiny does not apply here because Congress can favor some nationalities over others in immigration law. See Mathews, 426 U.S. at 78-80 & n. 13; In re Longstaff, 716 F.2d at 1442 ("Congress can bar aliens from entering the United States for discriminatory and arbitrary reasons . . . .").

8

NACARA easily withstands constitutional challenge. Due to diplomatic circumstances, the United States had encouraged Nicaraguans and Cubans to remain in this country, and also had given special protection to other Central American and Eastern European groups. See 143 Cong. Rec. S12,261 (daily ed. Nov. 9, 1997) (statement of Sen. Abraham). NACARA was intended to correct a provision in the IIRIRA that would have had the effect of "changing the rules in the middle of the game for thousands of Central Americans and others who came to the United States because their lives and families had been torn apart by war and oppression." Id.  Since IIRIRA changed the rules for suspension of deportation and the INS and the BIA maintained that the change was intended to apply to pending cases, there was concern that the United States should not violate earlier understandings with these particular groups of aliens. Id. Congress thus drew the line at certain nationalities. We refuse to rework this legislative compromise.

IV.

The new stop-time rule clearly and constitutionally applies to Appiah's pending deportation proceedings. He was served an order to show cause before seven years had elapsed, making him ineligible for a suspension of deportation. For the foregoing reasons, the petition for review is denied and the decision of the Board of Immigration Appeals is

AFFIRMED.

9