# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-2735

_____

| | | |
|---|---|---|
| Folorunso Adeyinka Afolayan, | * | |
| Grace Afolayan, | * | |
| | * | |
| Petitioners, | * | Petition for Review of an Order |
| | * | of the Immigration and Naturalization |
| v. | * | Service. |
| | * | |
| Immigration and Naturalization | * | |
| Service, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: April 17, 2000
Filed: July 24, 2000

_____

Before WOLLMAN, Chief Judge, LAY and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Folorunso Adeyinka Afolayan and Grace Afolayan ask this court to reverse an order of the Board of Immigration Appeals (BIA) denying their request for discretionary suspension of a deportation order issued by the Immigration and Naturalization Service (INS). We deny the Afolayans' petition.

# I.
## Facts and Background

Folorunso Adeyinka Afolayan, a citizen and native of Nigeria, entered the United States on March 1, 1984, following the INS's decision to award him a non-immigrant student visa. Mr. Afolayan's wife, Grace, who is also a Nigerian citizen and native, entered the United States on March 15, 1985, as the spouse of a non-immigrant student. Upon his arrival in the United States, Mr. Afolayan enrolled in a graduate studies program at the University of California at Davis. Mr. Afolayan, however, did not maintain his student status, and the Afolayans did not depart the United States upon the expiration of Mr. Afolayan's student visa.

On October 6, 1987, the INS served the Afolayans with an Order to Show Cause as to why, in view of Mr. Afolayan's failure to maintain his student status, they should not be deported. On January 26, 1988, the Afolayans appeared before an administrative hearing officer (ALJ) of the INS. Following the hearing, the ALJ entered an order permitting the Afolayans a voluntary departure from the United States. The ALJ also issued an alternative order directing the Afolayans' deportation in the event that they failed to comply with the voluntary departure portion of the order. The Afolayans did not comply with the ALJ's order and remained in the United States.

Six years after their show cause hearing, the Afolayans petitioned the INS to grant them discretionary relief by suspending the 1988 deportation order. The Afolayans based their request upon § 244(a)(1) of the Immigration and Naturalization Act. See 8 U.S.C. § 1254(a)(1) (repealed). Section 244(a)(1) allowed undocumented aliens who resided in the United States for seven or more consecutive years to petition the INS for suspension of a deportation order, if such deportation would result in extreme hardship to the alien or to an immediate relative of the alien. An ALJ denied the Afolayans' request on the basis that they failed to demonstrate extreme hardship. The Afolayans appealed the ALJ's decision to the BIA.

During the pendency of the Afolayans' petition with the BIA, Congress enacted the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (IIRIRA). IIRIRA contains a stop-time rule that applies to undocumented aliens seeking discretionary suspension of a deportation order. The stop-time rule provides that "any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served with a notice to appear" before the INS as the subject of a removal proceeding. 8 U.S.C. § 1229b(d)(1) (Supp. III 1997).

Following IIRIRA's enactment, a question arose as to whether the stop-time measure applied to show cause orders issued prior to the Act's effective date. The question, however, was answered when President William Jefferson Clinton signed the Nicaraguan Adjustment and Central American Relief Act (NACARA) into law. NACARA provides that IIRIRA's stop-time rule applies to show cause orders issued before, on, or after IIRIRA's enactment date of September 30, 1996. See NACARA § 203(a), 8 U.S.C. § 1101 note (Supp. III 1997) (Effective Date of 1996 Amendments).

In 1997, the BIA denied the Afolayans' petition. The BIA concluded that based upon the IIRIRA, the INS's 1987 show cause order terminated their period of continuous residence in the United States. The BIA also found that the Afolayans were not eligible for discretionary relief because they failed to accumulate the necessary seven years of continuous presence in the United States before service of the show cause order. The Afolayans ask this court to review the BIA's decision.

## II.
## Discussion

The Afolayans raise multiple challenges to the BIA's decision. They contend that the BIA erred in retroactively applying IIRIRA and in calculating the seven-year period of continuous presence. We review de novo a federal agency's legal

-3-

determinations, but we accord substantial deference to the agency's interpretation of a federal statute. See Vue v. INS, 92 F.3d 696, 699 (8th Cir. 1996). In fact, we must defer to the agency's interpretation unless it is inconsistent with the plain language of the statute or constitutes an unreasonable interpretation of an ambiguous statute. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45 (1984).

## A. Retroactive Application of IIRIRA's Stop-Time Provision

The Afolayans argue that IIRIRA's stop-time measure should not apply to their petition because their deportation proceedings were commenced years before the statute's effective date of April 1, 1997. The Afolayans contend that the BIA's decision contravenes IIRIRA's plain language and imposes an unreasonable retroactive burden on them.

The Supreme Court articulated a multipart test for determining the retroactivity of a statute. See Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994). In accordance with the Landgraf test, a court's first task is to determine whether Congress specifically addressed the question of retroactivity. If Congress has expressed a preference for retroactivity, then the court must adhere to congressional intent. See id. If the statute is silent or ambiguous, then the court must assess "whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id. If retroactive application of the ambiguous statute would impose such burdens on a party, then the court should not apply the statute in a retroactive manner. See id.

As an initial matter, the Landgraf test requires us to examine the plain language of IIRIRA and determine whether Congress clearly intended a retroactive effect. Examining the statute's language, it becomes apparent that IIRIRA generally does not

apply to deportation proceedings initiated prior to April 1, 1997. See Appiah v. United States INS, 202 F.3d 704, 707 (4th Cir. 2000), petition for cert. filed, No. 99-10039 (U.S. June 15, 2000). IIRIRA, however, does affect certain deportation proceedings regardless of whether they were commenced before the Act's effective date. See id. at 707-08. Our task is to determine whether show cause orders issued prior to IIRIRA's effective date fall into the latter category. We note that the BIA resolved this issue. In In re Nolasco-Tofino, Int. Dec. 3385 (BIA 1999), the BIA held that § 203(a) of NACARA mandates the application of IIRIRA's stop-time measure to orders to show cause issued before IIRIRA's effective date. In reaching its decision, the BIA relied upon the plain language of NACARA. Such reliance was well-placed.

NACARA specifically states that IIRIRA's stop-time rule "shall apply to orders to show cause . . . issued before, on, or after" IIRIRA's enactment date of September 30, 1996. See NACARA § 203(a), 8 U.S.C. § 1101 note (Supp. III 1997) (Effective Date of 1996 Amendments). Such language is plain and unambiguous. From the explicitness of the language, we conclude that IIRIRA's stop-time rule applies to deportation proceedings where the INS issued a show cause order prior to the Act's effective date. Moreover, the statute's plain language compels us to conclude that Congress clearly intended a retroactive application of the stop-time measure. Landgraf requires no further examination of this issue. See 511 U.S. at 280. Hence, the Afolayans' challenge to the BIA's determination of the retroactive application of IIRIRA's stop-time measure fails.

**B. Calculating Seven Years of Continuous Residence**

The Afolayans argue that even if the stop-time measure applies retroactively, they resided in the United States for more than seven continual years. Hence, they maintain, IIRIRA's stop-time measure is inapplicable. Although the Afolayans acknowledge that they had resided in the United States for less than seven years when the INS served them with a show cause order, they contend that a new seven-year

clock started after the issuance of the order. They further argue that following the issuance of the show cause order, they accrued at least seven years of continuous residence in the United States and, thus, are eligible for discretionary suspension of deportation. See 8 U.S.C. § 1229b(a). At the outset, we note that the Afolayans apparently failed to raise this issue before the BIA. We lack jurisdiction to review claims that were not presented to the BIA in the first instance. See Feleke v. INS, 118 F.3d 594, 600 (8th Cir. 1997). Even if, however, the issue is properly before this court, we must conclude that the Afolayans' claim cannot succeed.

The BIA recently addressed the seven-year continuity issue in In re: Mendoza-Sandino, Int. Dec. 3426, 2000 WL 225840 (BIA Feb. 23, 2000). In Mendoza-Sandino, a majority of the en banc BIA concluded "that the continuous physical presence clock does not start anew after the service of an Order to Show Cause so as to allow an alien to accrue the time required to establish eligibility for suspension of deportation subsequent to the service of an Order to Show Cause." Id. at 5-6. The BIA's published decision is binding precedent upon all the administrative immigration proceedings of the INS. See 8 C.F.R. § 3.1(g) (1999).

The BIA based its decision on IIRIRA's language and legislative history. The BIA's opinion focuses extensively on the differences in wording between the statute's termination of continuous presence provision, see 8 U.S.C. § 1229b(d)(1), and its break in continual service paragraph. See 8 U.S.C. § 1292b(d)(2). The BIA's opinion notes that under § 1229b(d)(2), an alien who departs the United States for a period in excess of 90 days "shall be deemed to have failed to maintain continuous physical presence in the United States." In re: Mendoza-Sandino, Int. Dec. 3426 at 6-7. The opinion contrasts the § 1229(b)(2) language with the language from § 1229(b)(1). Under § 1229(b)(1), an alien's period of continuous physical presence in the United States "shall be deemed to end when the alien is served" a show cause order. The BIA's opinion concludes that the use of the word "end" in § 1229(b)(1) and "break" in § 1229(b)(2) demonstrates that Congress intended to restart the seven-year clock upon certain events

-6-

such as returning to the United States after an absence in excess of 90 days but did not intend to restart the seven-year clock upon events such as the INS's issuance of a show cause order. See In re: Mendoza-Sandino, Int. Dec. 3426 at 6-7. The BIA's opinion notes further that pursuant to § 1229(d)(1), an alien's period of continuous physical presence ends upon the issuance of a notice to show cause or upon the alien's commission of certain criminal offenses, "whichever is earliest." 8 U.S.C. § 1229(d)(1). The BIA's opinion concludes that allowing the seven-year clock to restart following the issuance of a deportation order "would render the 'whichever is earliest' clause superfluous." In re: Mendoza-Sandino, Int. Dec. 3426 at 8.

After examining the applicable IIRIRA provisions and the BIA's opinion in its entirety, we conclude that the BIA's opinion is reasonable and consistent with the statute's language and legislative history. Hence, we must defer to the agency's decision and deny the Afolayans' request to reverse the BIA's ruling on this issue.

## C. Constitutional Challenges

The Afolayans raise two challenges to the constitutionality of the statutory provisions at issue in this case. They contend that NACARA violates both the Due Process and Equal Protection Clauses of the United States Constitution. Both challenges lack merit.

### 1. Due Process Challenge

The Afolayans argue that NACARA violates the Constitution's Due Process Clause because it irrationally deprives them of an opportunity for a suspension of deportation hearing. The Afolayans' challenge is baseless. The Due Process Clause requires only that an alien receive notice and a fair hearing where the INS must prove by "clear, unequivocal, and convincing" evidence that the alien is subject to

deportation.  See Woodby v. INS, 385 U.S. 276, 286 (1966).  The Afolayans received notice and a fair hearing in this case.  Hence, their Due Process challenge must fail.

### 2. Equal Protection Challenge

The Afolayans contend that NACARA is unconstitutional because it impermissibly favors certain nationalities.  The statute exempts designated nationals from the strictures of IIRIRA's deportation rules.  The nationals exempted include Salvadorans, Guatemalans, nationals of Russia and any republic of the former Soviet Union, Estonia, Latvia, Lithuania, Poland, Czechoslovakia, Romania, Hungary, Bulgaria, Albania, Yugoslavia (and its successor republics), and East Germany.  See 8 U.S.C. § 1101 note (Supp. III 1997) (Effective Date of 1996 Amendments).

It is well-established that Congress may favor some nationalities over others when enacting immigration law.  See Mathews v. Diaz, 426 U.S. 67, 78-80 (1976).  Hence, we accord great deference to Congress's process of "line drawing" with regard to favoring nationalities in the immigration context.  See Fiallo v. Bell, 430 U.S. 787, 795 n.6 (1977).  Congress's decision to favor specific nationalities under NACARA stems from a diplomatic decision of the government to encourage certain aliens to remain in the United States.  See Appiah, 202 F.3d at 710.  Such a decision certainly passes constitutional muster, and we will not second-guess the wisdom of this essentially political question.  See Fiallo, 430 U.S. at 799.  Accordingly, we must reject the Afolayans' Equal Protection challenge.

## III.
## Conclusion

For the reasons stated herein, we deny the Afolayans' petition.

A true copy.

Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.