**Anant RAM; Sangeeta Ram; Nazra Bibi Ram, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 99–70918.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 2000

Opinion Filed Feb. 8, 2001

As Corrected March 15, 2001

Nancy A. Fellom, Fellom & Solorio, San Francisco, California, for the petitioners.

Susan K. Houser, United States Department of Justice, Washington, D.C., for the respondent.

Before: B. FLETCHER, O'SCANNLAIN, and GOULD, Circuit Judges.

RONALD M. GOULD, Circuit Judge:

Anant Ram, his wife, Nazra Bibi Ram, and their daughter, Sangeeta Ram (collectively, "Petitioners") petition for review of their final order of deportation entered by the Board of Immigration Appeals ("BIA")

on June 29, 1999. Petitioners contend that they were eligible for suspension of deportation, and challenge the BIA's decision to apply the "stop-time rule"—a new continuous physical presence requirement set forth in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")—to their applications for such relief. We deny the petition and hold that the stop-time rule applies to Petitioners.

## FACTS AND PROCEDURAL HISTORY

Petitioners are ethnic Indian natives and citizens of Fiji. Fleeing a series of coups in Fiji, Petitioners entered the United States on August 22, 1987 as non-immigrant visitors. Because Petitioners remained in this country longer than their visas permitted, the Immigration and Naturalization Service ("INS") served Petitioners with Orders to Show Cause ("OSCs") on May 17, 1988. The OSCs charged Petitioners as aliens deportable under section 241(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1251(a)(1)(B) (1994).

At Petitioners' deportation hearing, the Immigration Judge ("IJ") found them deportable, denied their petitions for asylum and withholding of deportation, and granted voluntary departure. Petitioners appealed first to the BIA, which affirmed the IJ, and then to this court. We denied their petition on January 12, 1995. *Ram v. INS*, 46 F.3d 1144 (9th Cir.1995) (unpublished disposition).

On November 16, 1994, while their petition to this court was pending, Petitioners moved to reopen their deportation proceedings to apply for suspension of deportation. Petitioners argued that suspension was appropriate because, while they were in deportation proceedings, they attained the seven years of continuous physical presence necessary to qualify for such relief. The BIA denied Petitioners' motion.[1] On appeal, we reversed and remanded to

the BIA for further review of hardship. *Ram v. INS*, 107 F.3d 17 (9th Cir.1997) (unpublished disposition).

On remand, the BIA summarily denied Petitioners' motion on the sole ground that they had not satisfied IIRIRA's new stop-time rule. That rule requires aliens to meet the continuous physical presence requirement *before* their deportation proceedings commence. INA § 240A(d)(1), 8 U.S.C. § 1229b(d)(1) [hereinafter "INA section 240A(d)(1)" or "the stop-time rule"]. Petitioners now petition for review of the BIA final order, contending that: (1) the stop-time rule does not apply to OSCs where an alien seeks suspension of deportation; (2) the application of the stop-time rule to Petitioners violates due process because it is impermissibly retroactive; (3) IIRIRA section 309(c)(5) violates equal protection because it exempts some aliens from the stop-time rule on the basis of their national origin; and (4) in calculating Petitioners' period of continuous physical presence, the BIA should have considered time accumulated after service of the OSCs.

Because this petition falls under IIRIRA's transitional rules, *Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir.1997), we have jurisdiction pursuant to 8 U.S.C. § 1105a(a), as amended by IIRIRA section 309(c). *Avetova–Elisseva v. INS*, 213 F.3d 1192, 1195 n. 4 (9th Cir.2000).

## STATUTORY BACKGROUND

Three sets of rules concern us here: (1) the old INA rules, which governed before IIRIRA's effective date; (2) IIRIRA's new permanent rules, which took effect April 1, 1997; and (3) IIRIRA's transitional rules, which determine whether an old rule or a new rule from IIRIRA applies to aliens who were in the administrative process when IIRIRA took effect ("transitional rule aliens"). Here, we consider these

---

**1.** Two members of the Ram family, daughters Reena and Reeta Ram, were allowed to reopen their deportation proceedings for adjustment of status because they had married United States citizens. They are not parties to the current petition.

rules as they apply to suspension of deportation.

Before IIRIRA, an alien was eligible for suspension of deportation if (1) he or she "ha[d] been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of [the] application" for suspension of deportation; (2) he or she was a "person of good moral character"; and (3) deportation would result in "extreme hardship" to the alien or to an immediate family member who was a United States citizen or a lawful permanent resident. INA § 244(a)(1), 8 U.S.C. § 1254(a)(1) (1994). Aliens accrued time toward the "continuous physical presence in the United States" requirement until they applied for suspension of deportation. In short, the commencement of deportation proceedings had no effect on this accrual.

Congress fundamentally altered this system in 1996 when it enacted the stop-time rule set forth in IIRIRA. Motivated by a belief that "[s]uspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued ... even after they have been placed in deportation proceedings," H.R.Rep. No. 104–469(I), at 390 (1996), *available in* 1996 WL 168955, Congress changed the continuous physical presence requirement. Under IIRIRA's new rule, the period of continuous physical presence ends when deportation proceedings commence:

(1) Termination of continuous period

For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served with a notice to appear under section 1229(a) of this title or when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1882(a)(2) of this title or removable from the United States under section 1227(a)(2) or

1227(a)(4) of this title, whichever is earliest.

INA § 240A(d)(1).

The majority of IIRIRA's new rules do not apply to transitional rule aliens, like Petitioners. IIRIRA § 309(c)(1). However, it is undisputed that the transitional rule applicable here—the "Transitional Rule[ ] with Regard to Suspension of Deportation"—mandates the application of the stop-time rule to at least some of them.

(A) In General.—Subject to subparagraphs (B) and (C), paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) [the stop-time rule] shall apply to orders to show cause ... issued before, on, or after the date of the enactment of this Act [September 30, 1996].

IIRIRA § 309(c)(5)(A).

The question we must answer, and the issue about which the parties disagree, is whether Petitioners fall within the boundaries of this transitional rule, and thus, the stop-time rule.

Before proceeding with our analysis, it is useful to summarize certain of IIRIRA's changes to the structure and terminology of the INA. In IIRIRA, Congress created proceedings—with different names and slightly different requirements—that paralleled the pre-IIRIRA deportation scheme. Relevant here, *before IIRIRA,* aliens were placed in *deportation* proceedings after being served with an *OSC,* and could seek relief by applying for, inter alia, *suspension of deportation. After IIRIRA,* aliens were placed in *removal* proceedings after being served with a *Notice to Appear* ("NTA"), and could seek relief by applying for *cancellation of removal.* With these changes in mind, we proceed to our analysis.

## DISCUSSION

### A

"We review de novo an agency's interpretation of a statute." *Braun v. INS,* 992

F.2d 1016, 1018 (9th Cir.1993) (reviewing BIA's interpretation of the INA).

Although IIRIRA section 309(c)(5)(A) begins with the phrase "In General," Petitioners read this transitional rule narrowly and claim that it does not apply to them. Petitioners first note that IIRIRA section 309(c)(5)(A) expressly references and incorporates the stop-time rule set forth in INA section 240A(d)(1). Next, they observe that the stop-time rule itself references only the new immigration proceedings (e.g., "notices to appear," "removal," and "cancellation of removal"). In addition, because INA section 240A(d)(1) begins with the phrase "for purposes of this section," Petitioners claim that the application of the stop-time rule is limited to "this section" (i.e., limited to INA section 240A(d) which is entitled "Cancellation of removal; adjustment of status"). Based on these observations, Petitioners argue that IIRIRA section 309(c)(5)(A) can only apply in one very limited circumstance: namely, where a transitional rule alien served with an OSC under pre-IIRIRA law is ultimately placed in removal proceedings (after April 1, 1997), from which he or she seeks cancellation of removal.[2] Petitioners—who were served with OSCs, but remain in deportation proceedings and seek suspension of deportation—argue that they fall outside the scope of IIRIRA section 309(c)(5)(A).

2. Under IIRIRA section 309(c)(2), the Attorney General has authority to process a transitional rule alien under IIRIRA's permanent provisions so long the alien had not had an evidentiary hearing as of April 1, 1997.

3. See Almendarez–Torres v. United States, 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (a statute's title and a section's heading may be used to interpret its meaning); see also West Coast Truck Lines, Inc. v. Arcata Cmty. Recycling Ctr., 846 F.2d 1239, 1243 (9th Cir.1988) (although titles cannot expand the meaning of a statute, we may rely on them to interpret ambiguities within the context of a statute).

■ Petitioners' narrow reading of IIRIRA section 309(c)(5)(A) is not frivolous and warrants careful consideration. But we find more reasonable the statutory interpretation urged by the government.

First, the explicit title of IIRIRA section 309(c)(5) ("Transitional Rules with Regard to Suspension of Deportation"),[3] the introductory phrase of IIRIRA section 309(c)(5)(A) ("In General"), and the specific reference to OSCs in IIRIRA section 309(c)(5)(A) suggest that, absent narrow circumstances not applicable here,[4] the stop-time rule applies to suspension of deportation cases heard by an IJ or on appeal after IIRIRA took effect.[5]

Moreover, notwithstanding Petitioners' arguments, there is good reason for the stop-time rule to refer only to the new immigration procedures while still generally applying to applications for suspension of deportation through IIRIRA section 309(c)(5)(A). Because the stop-time rule is a permanent provision while IIRIRA section 309(c)(5)(A) is a transitional rule, it is logical that the stop-time rule refers to permanent procedures (such as NTAs, removal and cancellation of removal) while the transitional rule refers to procedures made obsolete by the permanent rules. See 2A Norman J. Singer, Sutherland Statutory Construction § 20.21 (4th ed.1986) (good legislative drafting dictates that temporary provisions not be placed in the body of permanent law).[6]

4. See IIRIRA section 309(c)(5)(C) (exempting certain transitional rule aliens from the stop-time rule on the basis of their national origin).

5. Pursuant to our holding in Astrero v. INS, 104 F.3d 264 (9th Cir.1996), IIRIRA's new stop-time rule could not be applied before its effective date of April 1, 1997. Id. at 266.

6. Citing permanent provisions in IIRIRA that refer to both old and new immigration procedures, Petitioners argue that if Congress intended the stop-time rule to apply to suspension applications, the rule should refer to both the old and new regimes. This argument fails. Although it may have been necessary to include old terminology in certain permanent provisions, there is no reason to mention ob-

Finally, when read in context, the "for purposes of this section" language in the stop-time rule does not, as Petitioners suggest, necessarily limit the scope of IIRIRA section 309(c)(5)(A) to removal proceedings. *See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (in analyzing the plain language of a statute, we consider the language at issue as well as "the language and design of the statute as a whole"); *Beno v. Shalala,* 30 F.3d 1057, 1068 (9th Cir.1994) (" 'the meaning of statutory language, plain or not, depends on context' "). Here, the stop-time rule is not being applied "for purposes of [INA section 240A(d) ]." Rather, it is being incorporated by reference in the application of another section, namely, IIRIRA section 309(c)(5)(A).

Although we initially view the government's reading of IIRIRA section 309(c)(5)(A) as the most reasonable interpretation, we recognize that the statute's plain language is not free from ambiguity. Thus, we consider the statute's legislative history. *United States v. Hockings,* 129 F.3d 1069, 1071 (9th Cir.1997). In this case, that legislative history resolves any ambiguity in favor of the government.

As originally enacted, the Transitional Rule with Regard to Suspension of Deportation referred only to NTAs, and not to OSCs.[7] This caused confusion because NTAs were not used in deportation proceedings until IIRIRA took effect on April 1, 1997. It made no sense to have a rule addressing NTAs issued "before" IIRIRA was effective.

The BIA attempted to clarify this ambiguity in *In re N–J–B–,*[8] by interpreting the phrase "notices to appear" to include all charging documents that initiated deportation or removal proceedings, including OSCs. After the BIA issued *N–J–B–,* the Attorney General vacated the decision and certified it for review. Before she acted, however, President Clinton signed into law the Nicaraguan Adjustment and Central American Relief Act of 1997 ("NACARA"). NACARA section 203(a), entitled "Modification of Certain Transitional Rules," amended IIRIRA section 309(c)(5) by, inter alia, replacing the reference to "NTAs" with a reference to "OSCs." This change is effective as if originally included in IIRIRA, and is currently in effect. NACARA § 203(f).

Two legislative explanatory memoranda accompanying NACARA unmistakably demonstrate that Congress intended the stop-time rule to apply generally to transitional rule aliens, like Petitioners, whose deportations were initiated by OSCs and who seek suspension of deportation. According to a bipartisan explanatory statement from the Appropriations Committee, NACARA's changes to IIRIRA "state that the 'stop time' rule established ... [in INA section 240A(d)(1) ] shall apply *generally* to individuals in deportation proceedings before April 1, 1997...." 143 Cong. Rec. S12658–01, at *S12660 (1997), *available in* 1997 WL 712581 (Cong.Rec.) (emphasis added). Similarly, a memorandum prepared by the Senate Appropriations Committee for presentation in the House of Representatives, stated that NACARA *"generally codifies the majority decision in Matter of N–J–B* by stating explicitly that orders to show cause have the same 'stop-time' effect as notices to appear." 143 Cong. Rec. S12265–01, at *S12266 (1997), *available in* 1997 WL 693186

---

solete procedures in the stop-time rule because any pre-IIRIRA cases to which the stop-time rule applies are governed by IIRIRA section 309(c)(5)(A).

**7.** Specifically, the rule provided:

Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical

presence) shall apply to *notices to appear* issued before, on, or after the date of the enactment of this Act.

IIRIRA section 309(c)(5) (emphasis added).

**8.** Int. Dec. 3309, 1997 WL 107593 (BIA 1997), *vacated,* Att'y Gen. Order. No.2093–97 (July 10, 1997) (redesignated as *Matter of N–J–B–,* Int. Dec. 3415 (1999)).

(Cong.Rec.) (emphasis added). Both of these legislative statements reflect a clear Congressional intent to apply IIRIRA section 309(c)(5)(A) generally to suspension of deportation cases heard on or after April 1, 1997.

Our conclusions are reinforced by consistent precedent from six other circuits and the BIA. *Appiah v. INS*, 202 F.3d 704, 708 (4th Cir.2000); *Gonzalez–Torres v. INS*, 213 F.3d 899, 903 (5th Cir.2000); *Angel–Ramos v. Reno*, 227 F.3d 942, 947 (7th Cir.2000); *Afolayan v. INS*, 219 F.3d 784, 788 (8th Cir.2000); *Rivera–Jimenez v. INS*, 214 F.3d 1213, 1217 (10th Cir.2000); *Tefel v. Reno*, 180 F.3d 1286, 1293 (11th Cir.1999), *cert. denied*, 530 U.S. 1228, 120 S.Ct. 2657, 147 L.Ed.2d 272 (2000); *In re Nolasco–Tofino*, Int. Dec. 3385, 1999 WL 218466 (BIA 1999) (en banc).

Because the legislative history of NACARA resolves any ambiguity in the plain language of IIRIRA section 309(c)(5)(A), we conclude that there is only one reasonable interpretation of this statute. We hold that IIRIRA section 309(c)(5)(A) generally applies the stop-time rule to transitional rule aliens whose deportations were initiated with the service of an OSC and who seek suspension of deportation.

### B

Petitioners also raise a due process challenge to the BIA's decision to apply IIRIRA section 309(c)(5)(A). They contend that, because they were placed in deportation proceedings and sought suspension of deportation before IIRIRA took effect, the application of IIRIRA section 309(c)(5)(A) to them is impermissibly retroactive. We disagree.

■ We review constitutional challenges *de novo. Yao v. INS*, 2 F.3d 317, 318 (9th Cir.1993). When a case implicates a federal statute enacted after the events at issue have occurred, "the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Prods.*, 511 U.S.

244, 280, 114 S.Ct. 1483 (1994). If Congress has done so, "there is no need to resort to judicial default rules." *Id.* Thus, we must determine whether Congress expressly prescribed the reach of IIRIRA section 309(c)(5)(A). *Scott v. Boos*, 215 F.3d 940, 943 (9th Cir.2000) ("If Congress has made its intent express, the statute should be applied accordingly.").

Under IIRIRA section 309(c)(5)(A), the stop-time rule applies to all "orders to show cause ... issued *before, on, or after* the date of enactment of [IIRIRA]." (Emphasis added.) By using the phrase "before, on, or after," Congress expressly delineated this statute's reach. *See Aragon–Ayon v. INS*, 206 F.3d 847, 852 (9th Cir. 2000) (language that "term applies regardless of whether the conviction was entered before, on, or after September 30, 1996" clearly manifests congressional intent for retroactivity); *Magana–Pizano v. INS*, 200 F.3d 603, 611 n. 10 (9th Cir.1999) (requirement that amendments "apply to applications filed before, on or after [AEDPA's enactment]" provides a clear effective date); *Oluwa v. Gomez*, 133 F.3d 1237, 1240 (9th Cir.1998) ("Congress expressly prescribed [statute's] proper reach" by stating that the "[statute] shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title."); *Feroz v. INS*, 22 F.3d 225, 227 (9th Cir.1994) (language requiring amendment to apply "to convictions entered before, on, or after the date of enactment of [the INA of 1990]" is a clear directive for retroactive application).

Other circuits to address the "before, on, or after" language in IIRIRA section 309(c)(5)(A) have held that it unambiguously demonstrates the intent of Congress to apply this statute retroactively. *Tefel*, 180 F.3d at 1302; *Afolayan*, 219 F.3d at 788; *Appiah*, 202 F.3d at 707–08.

The presumption against retroactive application arises from concerns about altering settled expectations, interfering with repose, and providing fair notice to those

affected by a statute. *Landgraf,* 511 U.S. at 265–66, 114 S.Ct. 1483. However, the United States Supreme Court has made clear in *Landgraf* that such considerations do not control when Congress has unequivocally shown its intent:

> Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits. Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.

*Id.* at 272–73, 114 S.Ct. 1483.

■ Congress was entitled to change the standards for suspension of deportation. Where this change shows a clear intent to apply the new stop-time rule to Petitioners, its application to bar the prospective relief of suspension of deportation does not offend due process. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483.

### C

■ Under IIRIRA section 309(c)(5)(C), transitional rule aliens from certain specified countries are exempt from the stop-time rule.[9] Petitioners, who do not originate from an exempted country, challenge the statute on equal protection grounds. Their challenge lacks merit.

We review this constitutional challenge *de novo. Yao,* 2 F.3d at 318. "Line-drawing" decisions made by Congress or the President in the context of immigration and naturalization must be upheld if they are rationally related to a legitimate government purpose. *See Heller v. Doe,* 509 U.S. 312, 319–20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). In NACARA, Con-

gress exempted (1) classes of aliens who had taken unusual risks in escaping from oppressive governments, and (2) aliens whose countries had been profoundly ravaged by war. 143 Cong. Rec. S12258–01, at *S12261–62 (1997), *available in* 1997 WL 693185 (Cong.Rec.).

We hold that this decision to favor aliens from specific war-torn countries must be upheld because it stems from a rational diplomatic decision to encourage such aliens to remain in the United States. Other circuits agree. *Angel–Ramos,* 227 F.3d at 948–49; *Afolayan,* 219 F.3d at 789; *Appiah,* 202 F.3d at 710; *Tefel,* 180 F.3d at 1298–99.

### D

Petitioners argue that—even if the stop-time rule generally applies to transitional rule aliens—the BIA erred in applying the rule to them because they accrued more than seven years of physical presence in the United States *after* their OSCs were served. The title, plain language, and legislative history of the stop-time rule foreclose this argument.

As noted above, we review the BIA's interpretation of the INA de novo. *Braun,* 992 F.2d at 1018. The title of INA section 240A(d)(1) is "Termination of continuous period." This title clearly manifests an intent to end, or "terminat[e]," the accrual of continuous physical presence under the circumstances set forth in INA section 240A(d)(1) (*i.e.,* upon service of a charging document). *See Almendarez–Torres,* 523 U.S. at 234, 118 S.Ct. 1219; *West Coast Truck Lines,* 846 F.2d at 1243. This intent is particularly evident when we contrast the title of INA section 240A(d)(1) with the title of INA section 240A(d)(2)— "Treatment of certain breaks in presence." Unlike the title of INA section 240A(d)(1), which connotes finality, the term "breaks" suggests that, under certain circumstances

---

9. Such countries are El'Salvador, Guatemala, the Soviet Union, any republic of the former Soviet Union, Russia, Latvia, Estonia, Lithuania, Poland, Romania, Czechoslovakia, Hun-

gary, Bulgaria, Albania, East Germany, Yugoslavia, and any state of the former Yugoslavia. NACARA § 203.

set forth in INA section 240A(d)(2), the clock can stop and then restart. Thus, when viewed together, these titles unambiguously indicate that Congress did not intend for aliens to circumvent the stop-time rule by accruing the requisite years of continuous physical presence in the United States after deportation proceedings commence. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (Where certain language is included in one section of a statute, but omitted in another, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Petitioners' remaining arguments are also unpersuasive. Observing that the stop-time rule refers to "any period of . . . continuous physical presence," Petitioners argue that the term "any" suggests that a second period of continuous physical presences begins upon service of an OSC. However, when read in context, this term refers to the fact that INA section 240 provides three types of relief—all of which require different lengths of continuous physical presence. It does not authorize post-OSC accumulation of time towards the physical presence requirement.

Finally, under the stop-time rule, an alien's period of continuous physical presence ends upon the service of a OSC or upon the commission of certain offenses, "whichever is earliest." INA § 240A(d)(1). Allowing the seven-year clock to restart post-OSC would render the "whichever is earliest" clause superfluous. *See Moskal v. United States*, 498 U.S. 103, 109–10, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) ("a court should give effect, if possible, to every clause and word of a statute" (internal quotation marks omitted)).

In short, the title and the plain language appear to demonstrate that an alien does not begin a new period of continuous physical presence after being served with an

OSC. However, to the extent that statute is ambiguous, the legislative history of INA section 240A(d) resolves any ambiguity in favor of the government. *Hockings*, 129 F.3d at 1071.

As noted above, Congress enacted the stop-time rule in response to a belief that aliens sought to delay deportation proceedings in order to meet the continuous physical presence requirement. H.R.Rep. No. 104–469(I), at 390 (1996). If, as Petitioners argue, the clocks restarts upon the issuance of an OSC, aliens would still have an incentive to delay their deportation proceedings after the OSC has been issued. Allowing the clock to restart would permit an end-run around Congress' intent. In resolving ambiguity of the statute by reference to legislative history, we will not here adopt a construction of the statute that defeats the obvious and direct intent of the legislature.

■ We therefore hold that an alien does not begin a new period of continuous physical presence after being served with an OSC.[10] Our decision on this issue is in accord with the BIA's decision in *In re Mendoza–Sandino*, Int. Dec. 3426, 2000 WL 225840 (pub. pages not available) (BIA 2000), and the Eighth Circuit's decision in *Afolayan*, 219 F.3d at 789 (deferring to *Mendoza–Sandino* on the grounds that the BIA's decision is reasonable and consistent with the statute's language and legislative purpose).

## CONCLUSION

We hold that (1) the stop-time rule applies generally to transitional rule aliens seeking suspension of deportation; (2) this application of the stop-time rule is not impermissibly retroactive and does not violate due process; (3) IIRIRA section 309(c)(5)'s exemption of certain aliens from the stop-time rule based on national origin does not violate equal protection; and (4)

---

10. Because the issue is not before us, we do not and need not address the situation where an alien served with an OSC prevails at the

deportation proceeding and later is served with a second OSC.

in calculating the continuous physical presence requirement, time accumulated after service of an OSC cannot be considered.

**PETITION DENIED.**