**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SYLVIA MASNAUSKAS,
                        *Petitioner,*

v.

ALBERTO R. GONZALES,* Attorney
General,

                        *Respondent.*

No. 03-72021

Agency No.
A74-810-052

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted October 21, 2005**
Pasadena, California

Filed December 30, 2005

Before: A. Wallace Tashima and Raymond C. Fisher,
Circuit Judges, and Milton I. Shadur,***
Senior District Judge.

Opinion by Judge Tashima

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2)(C).

***The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

16921

## COUNSEL

Michael J. Hernandez, Law Offices of Ronzio & Associates, Los Angeles, California, for the petitioner.

Ernesto H. Molina, Jr., Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

## OPINION

TASHIMA, Circuit Judge:

Petitioner Sylvia Masnauskas ("Masnauskas"), a native and citizen of Lithuania, petitions for review of the decision of the Board of Immigration Appeals ("BIA") summarily affirming the decision of the Immigration Judge ("IJ"). The IJ denied Masnauskas' application for derivative adjustment of status and for suspension of deportation under the Nicaraguan Adjustment and Central American Relief Act ("NACARA"). Masnauskas challenges NACARA on equal protection grounds, arguing that she should be eligible for derivative adjustment of status even though she is a not a national of Nicaragua or Cuba.

We have jurisdiction under 8 U.S.C. § 1252, as amended by § 106(d) of the REAL ID Act of 2005, Pub. L. No. 109-13, § 106(d), 119 Stat. 231, 311 (2005). *See Sotelo v. Gonzales*, 2005 WL 3302264, at *2 (9th Cir. Dec. 7, 2005). We reject the equal protection challenge and deny the petition for review.

## BACKGROUND

Masnauskas is a 47-year-old native and citizen of Lithuania. She arrived in the United States on December 4, 1991, and filed an application for asylum in 1995. On December 4, 1997, Masnauskas married Patricio Somarriba-Rugama ("Somarriba"), a 39-year-old citizen and national of Nicaragua. Somarriba arrived in the United States in September 1989, and applied for asylum in 1991. Later, he adjusted his status under NACARA § 202 to that of lawful permanent resident.

On July 12, 1996, the Immigration and Naturalization Service ("INS")[1] commenced deportation proceedings against

---

[1]The INS has been abolished and its functions transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L.

Masnauskas, by serving her with an Order to Show Cause. The INS charged Masnauskas with being deportable as an alien remaining in the United States longer than permitted, in violation of Immigration and Nationality Act ("INA") § 241(a)(1)(B), 8 U.S.C. § 1251(a)(1)(B) (1994). Masnauskas conceded that she was deportable and requested asylum and withholding of deportation. The IJ found Masnauskas deportable as charged, denied the applications for asylum and withholding, and granted an application for voluntary departure. Masnauskas filed an appeal to the BIA, which was dismissed as untimely.

After the enactment of NACARA, Masnauskas filed a motion to reopen for derivative adjustment of status under NACARA § 202 based on her marriage to a Nicaraguan national, and suspension of deportation under NACARA § 203 based on her status as a Lithuanian national. The IJ granted the motion to reopen, but then denied both the derivative application for adjustment of status and the application for suspension of deportation. The IJ found that Masnauskas was not a citizen of Cuba or Nicaragua and was therefore ineligible for derivative adjustment of status under NACARA § 202. Regarding suspension of deportation, the IJ found that Masnauskas was a citizen of Lithuania. However, the IJ also found that she had neither entered the United States on or before December 31, 1990, nor applied for asylum before December 31, 1991. Therefore, the IJ found Masnauskas ineligible for relief under NACARA § 203.

Masnauskas timely appealed the decision to the BIA, arguing that NACARA § 202 violates equal protection. The BIA summarily affirmed pursuant to 8 C.F.R. § 1003.1(e)(4). Masnauskas timely filed a petition for review.

No. 107-296, 116 Stat. 2142 (2002), 6 U.S.C. §§ 101-557. We will refer to the government agency as the INS.

## STANDARD OF REVIEW

Because the BIA affirmed the decision of the IJ without opinion, we review the decision of the IJ. *See Falcon Carriche v. Ashcroft*, 350 F.3d 845, 848 (9th Cir. 2003). We review constitutional challenges *de novo*. *Ram v. INS*, 243 F.3d 510, 517 (9th Cir. 2001).

## DISCUSSION

### I.   IIRIRA and NACARA

Before the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") took effect on April 1, 1997, an alien against whom deportation proceedings had been commenced could apply for suspension of deportation, provided that she had been continuously physically present in the United States for seven years, had "good moral character," and could show that deportation would result in "extreme hardship" to the alien or certain United States citizen relatives. 8 U.S.C. § 1254(a) (repealed 1997); *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 597 (9th Cir. 2002). IIRIRA, *inter alia*, repealed "suspension of deportation," and substituted "cancellation of removal," a more stringent standard for obtaining relief. *Id.* Cancellation of removal requires ten years of continuous physical presence, good moral character, and a showing of "exceptional and extremely unusual hardship" to certain United States citizen relatives. 8 U.S.C. § 1229b(b)(1).

Congress enacted NACARA in 1997 to ameliorate some of the harsher effects of IIRIRA for nationals of certain countries. NACARA was intended to correct provisions in IIRIRA that would have had the effect of "changing the rules in the middle of the game for thousands of Central Americans and others who came to the United States because their lives and families had been torn apart by war and oppression." 143 Cong. Rec. S12,261 (daily ed. Nov. 9, 1997) (statement of Sen. Abraham). NACARA § 202 created a new "adjustment

of status" process for qualified nationals of Nicaragua and Cuba. Pub. L. No. 105-100, § 202, 111 Stat. 2160, 2193-96 (1997).[2] A qualified alien who timely applies for adjustment shall be adjusted to permanent resident status, without having to demonstrate any level of hardship. *Id.* Under NACARA § 202(d), aliens who arrive in the United States after December 1, 1995, are also eligible for adjustment if they satisfy three requirements: being (1) a national of Nicaragua or Cuba, (2) the spouse or child of a qualified national of Nicaragua or Cuba, and (3) physically present in the United States when the adjustment application is filed. *Id.*

NACARA § 203(b) also created a "Special Rule for Cancellation of Removal" for aliens from certain countries. Under the special rule, aliens from those countries who apply for cancellation of removal are required to meet only the pre-IIRIRA standards of seven years of continuous presence, good moral character, and a showing of extreme hardship to the alien or citizen relatives. NACARA, Pub. L. No. 105-100, § 203(b), 111 Stat. 2160, 2198 (1997).[3] Any spouse or child of such an alien is also covered by the special rule. *Id.*

## II. Equal Protection Challenge to NACARA § 202(d)

Masnauskas challenges the first requirement of NACARA § 202(d), arguing that she should be eligible for derivative adjustment of status even though she is not a national of Nica-

---

[2]A qualified national of Nicaragua or Cuba is any alien who has been continuously physically present in the United States since December 1, 1995, and is admissible to the United States for permanent residence, notwithstanding certain otherwise applicable requirements, such as having a valid visa. *Id.*

[3]The countries covered by the provision are El Salvador, Guatemala, the Soviet Union, any republic of the former Soviet Union, Russia, Latvia, Estonia, Lithuania, Poland, Romania, Czechoslovakia, Hungary, Bulgaria, Albania, East Germany, Yugoslavia, and any state of the former Yugoslavia. *Id.*; *see Ram v. INS*, 243 F.3d 510, 517 n.9 (9th Cir. 2001).

ragua or Cuba. She claims that the nationality-based classification required by § 202(d) violates equal protection.

**[1]** Because Congress has broad power over immigration and naturalization, our review is limited. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." (citations and quotation marks omitted)). When challenged under equal protection, " '[l]ine-drawing' decisions made by Congress or the President in the context of immigration and naturalization must be upheld if they are rationally related to a legitimate government purpose." *Ram*, 243 F.3d at 517. Using such rational-basis review, a statute is presumed constitutional, and "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (citation and quotation marks omitted). Courts must accept a legislative classification even where "there is an imperfect fit between means and ends." *Id.*

**[2]** We have previously held that NACARA has a rational purpose because it was intended to favor aliens who had taken unusual risks in escaping from oppressive governments or whose countries had been ravaged by war. *Ram*, 243 F.3d at 517. The enactment of NACARA was a rational diplomatic decision to encourage such aliens to remain in the United States. *Id.* Nicaraguan aliens were a particular concern of Congress because of United States' involvement in the civil war in Nicaragua, the large number of Nicaraguan asylum-seekers in the 1980s, and a history of special programs for Nicaraguan aliens under the Carter and Reagan administrations. *See* 143 Cong. Rec. S12,261 (daily ed. Nov. 9, 1997) (statement of Sen. Abraham). Congress also specifically extended the adjustment of status procedure to Nicaraguan spouses and children of qualified Nicaraguan nationals, even if they had not been in the United States since 1995. *Id.* As the government contends, Congress had good reason to enact

this provision because families fleeing war-torn areas were not always able to travel together, and Congress wanted to keep Nicaraguan families together in the United States. We agree that this is a reasonable justification. Given the special diplomatic concern for Nicaraguan aliens and others of similar circumstances,[4] and the broad deference afforded to Congress in this field, we must uphold its decision to limit the scope of NACARA § 202(d) to spouses who are themselves Nicaraguan or Cuban nationals.[5]

## CONCLUSION

[3] The nationality-based classification in NACARA § 202(d) is rationally related to legitimate foreign policy concerns that Congress had when it enacted NACARA. Accordingly, we reject Masnauskas's equal protection challenge to NACARA § 202(d).

## PETITION FOR REVIEW DENIED.

---

[4]Although we primarily refer to Nicaraguans throughout this opinion, Congress' rationale for enacting NACARA applies equally to others identified in the text of the Act. *See* 143 Cong. Rec. S12,258 (daily ed. Nov. 9, 1997) (statement of Sen. Abraham) ("[T]hese Central American refugees — as well as refugees from other countries in like circumstances — face the realistic prospect that a retroactive change in our laws might uproot them yet again.").

[5]Masnauskas also argues that allowing non-Nicaraguan spouses to be derivative beneficiaries of their spouse's "special cancellation of removal" under NACARA § 203, but not derivative beneficiaries of their spouse's "adjustment of status" under NACARA § 202, is irrational. Because adjustment of status is a much more generous form of relief, not requiring any showing of hardship or good moral character, it is reasonable for its availability to be more narrow in scope.